Robert A. YOUST, Geraldine Youst,
and Denny S. Youst, Appellees

v.

KECK'S FOOD SERVICE,
INC. Appellant.

Superior Court of Pennsylvania.

Argued Jan. 28, 2014.

Filed June 11, 2014.

Richard D. Sheetz, Troy, for appellant.

Joshua J. Cochran, Williamsport, for appellees.

BEFORE: PANELLA, OLSON and PLATT,* JJ.

OPINION BY OLSON, J.:

Appellant, Keck's Food Service, Inc., appeals from the judgment entered on July 10, 2013, in favor of Robert A. Youst, Geraldine Youst, and Denny S. Youst (herein collectively "Appellees" or "the Yousts") and against Appellant. We affirm in part, vacate in part, and remand.

On September 16, 2009, the Yousts instituted the current action against Appellant. Within the Yousts' Second Amended Compliant, the Yousts averred the following.

Prior to 1992, Eugene and Doris Sargent (hereinafter "the Sargents") owned a large parcel of land in Tioga County, Pennsylvania. In 1992, the Sargents severed their unity of title over the property by conveying a portion of their land to Appellant. A few months later, the Sargents conveyed the adjoining parcel of land to the Yousts. The Yousts' Complaint, 3/2/10, at ¶¶ 4–7. Appellant now "operates a food service business on its property, including warehouse and distribution facilities, offices, and parking areas." *Id.* at ¶ 13. The Yousts created a farm on their parcel of property and the Yousts currently use the land for their residence, as well as for "the raising of cattle and horses, and the growing of crops." *Id.* at ¶ 10.

---

* Retired Senior Judge assigned to the Superior Court.

To travel to and from their property, the Yousts have an express easement across Appellant's property. *Id.* at ¶ 8. Prior to the commencement of the current action, the travel easement traversed the top of a dam that existed on Appellant's property—which was named the Charavoyne Dam (hereinafter "the Dam")—and the travel easement provided the Yousts with "ingress, egress, and regress from State Route 328 to [the Yousts'] property." *Id.* at ¶¶ 8 and 14–15. As the Yousts averred, the Dam had existed for about 100 years before the current lawsuit was filed, and, for this entire time, the Dam "held back a pond situate on [Appellant's] property." *Id.* at ¶¶ 16–17.

A stream, named Hammond Creek, runs through both Appellant's and the Yousts' properties. *Id.* at ¶¶ 18–19. At the time Appellant and the Yousts purchased their respective parcels of property, Hammond Creek ran into Appellant's property and then flowed into the dammed pond on Appellant's property. *Id.* at ¶ 18. Once inside the pond, the Hammond Creek "waters were gathered and detained by the Dam along with stormwater run-off and water from natural springs situate on [Appellant's] property." *Id.* When the pond water rose, "the gathered waters were discharged through an elevated spillway onto [the downstream property of the Yousts], where the flow of Hammond Creek recommenced, providing a regular and reliable source of water for [the Yousts'] livestock." *Id.* at ¶ 19.

In 2005, Appellant "constructed certain improvements to its property, including the construction of a 36,000 square foot warehouse facility, loading docks, [and] a paved parking lot." *Id.* at ¶ 24. Yet, according to the Yousts, when Appellant constructed these improvements, Appellant "altered the natural terrain of [Appellant's] property and eliminated areas that provided natural drainage and absorption of rainwater, directing storm water, instead, into the pond and, ultimately, through the spillway and onto [the Yousts'] property in increased amounts and with increased velocity." *Id.* at ¶ 33.

After Appellant completed the improvements to its property, Appellant began to modify the Dam by increasing the Dam's height and width and by increasing the size of the discharge pipes. *Id.* at ¶ 35. These Dam modifications caused the Dam to extend onto the Yousts' property. *Id.* Moreover, the Dam modifications—when combined with the effects from Appellant's 2005 property improvements—periodically caused "increased and forceful discharge of stormwater through the spillway and onto [the Yousts'] property, causing erosion, periodic flooding, property damage[ ], loss of pasture land, loss of livestock, and interference with [the Yousts'] use and enjoyment of their property." *Id.* at ¶ 37.

In 2009, Appellant removed the Dam. *Id.* at ¶ 41. "As part of its effort[ ] to remove the Dam, [Appellant] removed discharge pipes previously passing through the Dam, plugged the spillway (stopping the flow of water onto [the Yousts'] property), and began removing portions of the Dam." *Id.* at ¶ 52. Appellant also began "channeling stormwater runoff onto [the Yousts'] property with no on-site stormwater management system [and] caus[ing] periodic flooding and a continuing trespass on [the Yousts'] property." *Id.* at ¶ 61. The Yousts averred that, "[b]y removing the Dam and the pond, [Appellant] … interfere[d] with the regular and reliable supply of water to [the Yousts'] lands" and caused flooding and erosion on the Yousts' land. *Id.* at ¶ 63.

In response, the Yousts instituted the current action and levied multiple claims

against Appellant, including:[1]

Count 2—"Trespass" (claiming that, when Appellant removed the Dam, Appellant trespassed upon the Yousts' land);

Count 3—"Interference with Express Easement" (claiming that, when Appellant removed the Dam in 2009, Appellant interfered with the Yousts' travel easement and right-of-way);

Count 4—"Interference with Implied Easement" (claiming that the Yousts have an easement implied from prior use in the Dam, in the pond, and "for a regular and reliable source of water from lands now owned by [Appellant]");[2]

Count 5—"Interference with Easement by Necessity" (claiming that the Yousts have an easement by necessity in the Dam, in the pond, and "for a regular and reliable source of water from lands now owned by [Appellant]");

Count 6—"Private Nuisance" (claiming that Appellant's actions have resulted in both the excessive discharge of water onto the Yousts' property and the interruption of water onto the Yousts' property and, thus, constituted a private nuisance);

Count 8—"Demand for a Preliminary Injunction" (claiming that the Yousts are entitled to a preliminary injunction, enjoining Appellant from "obstruct[ing] and interfer[ing] with [the Yousts'] easement [implied from prior use] and/or necessity for a continuous, regular, and reliable source of water");

Count 9—"Demand for a Permanent Injunction" (claiming that the Yousts are entitled to a permanent injunction, enjoining Appellant from "obstruct[ing] and interfer[ing] with [the Yousts'] easement [implied from prior use] and/or necessity for a continuous, regular, and reliable source of water").

*Id.* at ¶¶ 75–134.

The parties proceeded to a consolidated trial, where the jury was tasked with deciding the trespass, private nuisance, and interference with express easement counts and the trial court was tasked with deciding the interference with easement implied from prior use, interference with easement by necessity, preliminary injunction, and permanent injunction counts. N.T. Trial, 8/1/12, at 316.

During the trial, the Yousts presented evidence which tended to support the above-summarized factual averments. Further, Denny Youst provided additional testimony as to Appellant's work in 2009—

1. For ease of reading and recognition, we have indented and separately paragraphed this portion of the opinion. Further, in reciting the Yousts' claims, we have included only those claims that are relevant to the current appeal.

2. Count 4 of the Yousts' complaint is generically titled "Interference with Implied Easement" and alleges that Appellant interfered with the Yousts' easement implied from prior use. The Yousts' Complaint, 3/2/10, at ¶¶ 89–97. However, an easement by necessity is also an implied easement—and Count 5 of the complaint claims that Appellant interfered with the Yousts' easement by necessity. *See* Restatement (Third) of Property: Servitudes § 2.11(a) ("[t]he creation of a servitude burden may be implied by the circumstances surrounding the conveyance of another interest in land, as provided in §§ 2.12 [('servitudes implied from prior use')] through 2.15 [('servitudes created by necessity')];") William B. Stoebuck & Dale A. Whitman, THE LAW OF PROPERTY § 8.5 (3d ed. 2000) ("[t]he second kind of implied easement is usually called a 'way of necessity'"); The Yousts' Complaint, 3/2/10, at ¶¶ 89–97 and ¶¶ 98–106. Therefore, in the interest of clarity, we will refer to Count 4 of the Yousts' complaint as claiming "interference with easement implied from prior use."

and the effects of that work on the Yousts' property.

Denny Youst testified that, prior to 2009, Hammond Creek flowed into the dammed pond on Appellant's land and, once in the pond, the creek water mixed with the fresh spring water that also filled the pond. *Id.* at 30–31. When the pond water rose, the water drained onto the Yousts' property—in a relatively controlled, regulated, and continuous fashion—through two side-by-side overflow drainage pipes: one of which was a 30–inch perforated plastic pipe and the other was an 18–inch perforated plastic pipe. *Id.* at 41–42. The water then flowed, inside of the Hammond Creek bed, through the Yousts' property. Denny Youst testified that the Yousts pastured their beef cattle, horses, and pigs in the surrounding field and that the animals received their water from the creek. *Id.* at 30–31.

In 2009, however, Appellant performed significant construction to the Dam, the pond, and Hammond Creek. Denny Youst testified that, in 2009, Appellant drained the pond, breached the Dam, and re-banked the pond approximately 20 feet away from its prior location—making it so that the pond did not drain into the Yousts' property through the drainage pipes.[3] *Id.* at 46. Appellant then removed the two side-by-side drainage pipes and replaced the pipes with one large, six-foot-high by six-foot-wide drainage pipe. *Id.* at 44–46. Finally, Appellant created a rock-lined bed that changed the direction of Hammond Creek. Specifically, where Hammond Creek used to flow into a corner of the pond, Appellant changed the course of Hammond Creek so that it flowed directly into the six-foot-high by six-foot-wide drainage pipe. *Id.* at 46–48.

From there, the creek flowed, unregulated, straight into the Yousts' pasture fields. *Id.* at 48.

Denny Youst testified that Appellant's year–2009 changes to the Dam, the pond, and the creek have had a deleterious effect on the Yousts' property. Denny Youst testified:

> Now ... if a rainstorm or thunderstorm comes up like last week did, you can ... take a rowboat ... [o]ut in my pasture and my barnyard. It just comes up, there's nothing stopping that runoff now, nothing at all, it just comes out full [tilt].
>
> ... [The pasture field now] floods a lot quicker [than it had previously].... [T]here's actually parts [ ] of my pasture that are kind of indented, the ducks and geese been swimming on it a week after the rains go away. It looks like its own little pond out there.

*Id.* at 48.

Denny Youst also testified that, when there is no precipitation, Hammond Creek runs dry. Thus, as a result of Appellant's year–2009 construction, the Yousts either have "too much water that you [are] drowned in it, or you have no water. There's no happy medium." *Id.* at 49.

Denny Youst testified that this inconsistent cycle of flooding and drought has caused some of his cows and horses to die in the field and has harmed his ability to pasture and water his animals. *Id.* at 50. As Denny Youst testified:

> A: [ ] I got pictures of a lot of down cows [lying] out there stuck in the mud because once this [area] dries out they— it gets real extremely muddy. I mean, the cows can't make it through it. And

---

**3.** Denny Youst testified that, even though Appellant drained the pond and removed the creek from the pond, "the pond didn't stay dry because it's spring fed[. It] filled right back ... up." N.T. Trial, 7/30/12, at 46.

I feel bad, but I have enough—you know, it's my barn, I mean, that's why I never replaced them. Until we get [this] done I'm [at] a standstill.

. . .

Q: ... [W]hen's the last time you lost a cow because of the condition of the land from the flooding?

A: I got one right now it has a bad leg and that it got caught up in some barbed wire that—when that fence that was in my pasture it had fallen down because it gets flooded out so many times and that one there we put down because it was ... infected and that ... was, oh, I'd say March.

. . .

A: ... between 2009 and [2010,] we lost all our calves for both years[,] like [30] of them. And we lost, I think, seven—I know seven [bred] cows. I had a horse go down on the ice. I lost a mare.

. . .

Q: Has the condition now with the six-foot pipe and the water that comes into your field has that [affected] how you feed your beef cows?

A: Yeah. We rotate our feed lots. We feed at the barnyard and we used to feed there at the gate there where [Appellant] raised it and then we'd rotate that because if you get even a couple cows eat[ing] at the same spot and it thaws and it freezes it just turns to mud and slop so we rotate where we put our round bales in and our corn silage.

Q: Are you able to feed your cows from food that you grow on your own property?

A: No. We had ... to rent ground to bail hay because I had to replace the pasture ground that we lost that we can't use because, again, I—we got pictures. It's—it doesn't grow, just weeds grow in [the field] now. So, I had to rent ground to replace ... my farm fields, my hay fields that I had to turn into pasture because I lost pasture.

. . .

Q: And when did this practice start where you had to start renting ... your neighbors['] hay land and buying bales privately?

A: Well, it really started right around the 2008, 2009 we started needing mostly 2009 and [2010] is when we opened up the two big fields that we used to cut hay off of. We needed to get more pasture ground because down below here where our pasture is at the barn, it's, it's gone, it's no good anymore.

*Id.* at 50 and 52–54; N.T. Trial, 7/31/12, at 63–64.

Hence, Denny Youst testified that, because of the flooding, the Yousts were forced to transform portions of their hay field into their new pasture field and that, because they lost some of their hay field, the Yousts were forced to rent hay ground, where they could harvest hay and supplement their hay supply.

At trial, the Yousts also presented the expert testimony of hydrologist Dr. Richard Crago. At the outset, during Dr. Crago's testimony, Dr. Crago testified as to the location of Hammond Creek; and, with respect to this issue, Dr. Crago contradicted the averments in the Yousts' complaint and the trial testimony of all other witnesses in this case.

In this case, the Yousts' complaint averred (and all other trial witnesses testified) that—when Appellant and the Yousts purchased their property from the Sargents—Hammond Creek ran through Appellant's property and then flowed into the dammed pond on Appellant's property. The Yousts' Complaint, 3/2/10, at ¶¶ 18–19. The Yousts' complaint averred that, once

inside the pond, the Hammond Creek "waters were gathered and detained by the Dam along with stormwater run-off and water from natural springs situate on [Appellant's] property." *Id.* Then, when the pond water rose, "the gathered waters were discharged through an elevated spillway onto [the downstream property of the Yousts'], where the flow of Hammond Creek re-commenced, providing a regular and reliable source of water for [the Yousts'] livestock." *Id.* at ¶ 19.

With the exception of Dr. Crago, all trial witnesses testified consistently with the above-described location of Hammond Creek. Thus, all trial witnesses testified that—when Appellant re-banked the pond and removed the Dam in 2009—Appellant removed **Hammond Creek** from the pond and re-channeled **Hammond Creek,** making it so that the creek ran directly into the Yousts' property.

However, Dr. Crago testified that—prior to Appellant's 2009 construction—the **headwater of Hammond Creek was the pond that existed on Appellant's land—** and that the water that ran through Appellant's property (and that fed the pond) was simply surface water that drained from the upper watershed.[4] Dr. Crago testified:

> Q: Okay. Now, [w]e've heard the term Hammond Creek referred to [as] the creek here that [ ] runs. As far as your research[,] what is Hammond Creek?

A: [T]he maps I've seen don't label it [ ] Hammond Creek until it leaves . . . [Appellant's] pond. So as it flows through the Youst property that seems to be when it's labeled Hammond Creek. Now, a lot of documents say the pond is the headwaters of the creek[,] meaning the furthest [upstream] point of the creek.

Q: So, . . . that channel that takes water [through Appellant's property,] underneath Route 328[, formerly] into the pond[,] and now directly onto the Youst farm[,] what was that called?

A: I haven't seen . . . a name for that.

Q: Does that . . . channel have water flowing through it continuously?

A: No, . . . during dry seasons[,] it seems to have no flow.

Q: Okay. But . . . what's the primary function of that channel?

A: **To convey storm water runoff from the part of the watershed,** which is—I don't have the numbers in my head, something like 80% of the watershed areas north of the highway. So **that channel conveys the water from north of the highway straight down through the six foot culvert.**

N.T. Trial, 7/31/12, at 172–173 (emphasis added).

Dr. Crago testified that the Dam and the pond served an important water management function with respect to the "storm water runoff" that came from Ap-

---

4. The Restatement (Second) of Torts differentiates between "surface water" and a "watercourse." According to the second Restatement:

 The term "surface water," as used in [the chapter concerning Riparian Rights], means water from rain, melting snow, springs or seepage, or detached from subsiding floods, that lies or flows on the surface of the earth but does not form a part of a watercourse or lake.

 Restatement (Second) of Torts § 846.

The second Restatement of Torts defines a "watercourse" in the following manner:

 (1) The term "watercourse," as used in [the chapter concerning Riparian Rights], means a stream of water of natural origin, flowing constantly or recurrently on the surface of the earth in a reasonably definite natural channel.

 (2) The term "watercourse" also includes springs, lakes or marshes in which a stream originates or through which it flows.

 Restatement (Second) of Torts § 841.

pellant's land and that flowed into the Yousts' land:

> Ponds are often used as storm water management facility and what they do it's ... a little bit like a bathtub with a ... bad drain, but it doesn't drain very quickly. So, when you turn the tub on the water goes into the tub and it's draining out, but it's flowing in a lot faster than it drains out. So, if you turn the water you're going to have flow leaving through the outlet of the tub, the drain, but the water's going to build up inside the tub. It's going to get deeper and deeper even though the drain is open because it's not open enough to ... handle all the flow....

> Now if you were to shut the water off you would have no more inflow and the water would drain out through ... the outlet. So, that's similar to a pond, which is a pond that has a small enough outlet that it cannot handle everything that comes in.

> So, during a high inflow event, during a storm, the water's going to get deeper behind the dam because it can't all go through the outlet pipe and in doing so you reduce the flow rate.

> So, in the bathtub example you never have an outflow rate as high as the inflow rate coming in through the spout into the tub and so when you have a pond in place you're not going to have as high of an outflow rate as the peak inflow rate.

> ...

> [So, with respect to the Yousts' land, when the dammed pond existed, the wa-

ter] would ... go toward storage within the pond itself. So it would—instead of discharging straight through the pipe it would fill up the pond and then the water would be released from the pond slowly over time because of the constricted outlet.

N.T. Trial, 7/31/12, at 168–170.

Dr. Crago testified that, when Appellant breached the Dam, re-banked the pond, and channeled the surface water away from the pond and directly onto the Yousts' property, Appellant drastically increased the peak flow rate of water onto the Yousts' property.[5] *Id.* at 172 and 178–180. Thus, the construction "led to increased flooding and more movement of soil" on the Yousts' property. *Id.* at 183.

The Yousts also presented the testimony of civil engineer Ronald Mease, of the Pennsylvania Department of Environmental Protection Dam Safety Division. Mr. Mease testified that, prior to the Dam's breach, "part of the [Dam] spillway extended [onto] the Youst property." N.T. 8/1/12, at 235. As Mr. Mease testified, since a part of the Dam existed on the Yousts' property, the Yousts were "a partial owner of that dam." *Id.*

Finally, as part of their case-in-chief, the Yousts presented the cross-examination testimony of Appellant's president and CEO, Brian Henry Keck. During Mr. Keck's testimony, Mr. Keck confirmed that, in 2009, Appellant changed the course of Hammond Creek so that the creek would not "go into the pond first[; instead], the creek [now] goes directly to a large pipe and onto the [Yousts'] farm."

5. With respect to the peak water flow onto the Yousts' land, Dr. Crago testified that Appellant's year–2009 construction caused the following: for a "one-year" storm event, "about [16–]times more water would come through [the] six-foot pipe as whatever was there before the six-foot pipe;" for a "two-year" storm event, approximately "ten-times more water" would enter the Yousts' land than prior to the construction; and, for a "ten-year" storm event, approximately four-times more water would enter the Yousts' land than prior to the construction. N.T. Trial, 7/31/12, at 178–180.

*Id.* at 277. Mr. Keck also confirmed that this change allowed for an increase in the peak water flow that would enter the Yousts' land. *Id.* at 282. Indeed, Mr. Keck testified that the 2009 construction caused a predictable change in water flow onto the Yousts' property:

> when we made the change in 2009 and we changed the status from a dam to a stream crossing and a stream channel, the [ ] pond no longer acted as a . . . retarder of water. The water that came onto our property went across our property and down the Hammond Creek, down the Hammond Creek onto the [Yousts'] property. . . . [The changes] concentrated the flow into the stream channel instead of overtopping the [D]am.

*Id.* at 280–281.

At the conclusion of the Yousts' case-in-chief, Appellant moved for a compulsory non-suit on the following counts and for the following reasons: Count 2—Trespass (arguing that the trespass claim was filed outside of the applicable statute of limitations); Count 3—Interference with Express Easement (arguing that the Yousts did not introduce any evidence that they suffered damages as a result of the interference); Count 4—Interference with Easement Implied from Prior Use (arguing that "there is no law that requires [Appellant] to keep a pond on his property" and the Yousts failed to prove "necessity"); Count 5—Interference with Easement by Necessity (arguing that the Yousts failed to prove the element of "necessity"); Count 6—Private Nuisance (arguing that the Yousts failed to prove their claim because the Yousts "failed in [their] burden of proof in demonstrating a legal cause of action"). *Id.* at 310–319. As is relevant to this appeal, the trial court denied all of Appellant's motions for compulsory non-suit. *Id.*

During Appellant's case-in-chief, Appellant presented the testimony of Dr. Clay Emerson, whom the trial court accepted as an expert in the fields of "surface water hydrology and hydraulics with a focus on storm water and [ ] dam engineering." *Id.* at 321.

Contrary to the Yousts' evidence, Dr. Emerson testified that—when the Dam existed on Appellant's land—"the [D]am just simply did not provide [a] regular and reliable source of water [for the Yousts' land]." *Id.* at 342. According to Dr. Emerson: "[t]he water that flowed into the pond is the water that flowed out of the pond and in periods of drought you would expect almost no water flowing into the pond and I would expect almost no water flowing out of the pond." *Id.*

During Dr. Emerson's direct testimony, Dr. Emerson also testified that both the Dam and the pond were artificial structures, and that the removal of the Dam has "removed what was a man-made artificial impoundment and structure and returned the flow characteristics of that portion of [the] land to what [it] would have been if the pond were never built in 1912." *Id.* at 346. Yet, on cross-examination, Dr. Emerson testified that he did not know the original course of Hammond Creek; Dr. Emerson thus did not know whether—when Appellant re-channeled Hammond Creek—Appellant returned the creek to its natural state. *Id.* at 380.

Next to testify for Appellant was Appellant's president and CEO, Mr. Keck. Mr. Keck testified that he chose to breach the Dam because the Dam had become unsafe. N.T. Trial, 8/2/12, at 2. Specifically, Mr. Keck testified, the pond waters within the Dam continuously overtopped the Dam and then flooded the road that existed on top of the Dam. *Id.*

Mr. Keck testified that, in 2005, Appellant attempted to rectify the overtopping problem by installing larger dam-overflow drainage pipes. *Id.* at 1–3. However, Mr. Keck testified, the drainage pipes were not large enough to alleviate the overtopping problem. *Id.* at 3. Indeed, Mr. Keck testified that the Pennsylvania Department of Environmental Protection (hereinafter "DEP") inspected the Dam and concluded that, because of the insufficient overflow drainage pipes, the Dam did not comply with DEP regulations—and that larger overflow drainage pipes were needed to bring the Dam into compliance with DEP regulations. *Id.* at 5. Mr. Keck testified that, after the DEP notified Appellant that the Dam was not in compliance with DEP regulations:

> The initial intent was to bring the [D]am into compliance and to make it so that it would meet the requirements of DEP, pass the required storm flows, which ... required [ ] two forty-eight[-inch overflow pipes]. Well, that's what the engineering required was two forty-eights, the installation of two forty-eight inch pipes.

*Id.*

While the installation of the larger overflow drainage pipes was being considered, Mr. Keck spoke with DEP officials and learned that the DEP would authorize the removal of the Dam. *Id.* at 5–6. Mr. Keck testified that he then applied for—and received—all of the governmental permits and authorization that were necessary for Appellant to remove the Dam.[6] *Id.* at 5–14. It was at this point that Appellant: drained the pond, breached the Dam, re-banked the pond approximately 20 feet away from its prior location, removed the two side-by-side overflow drainage pipes, replaced the overflow drainage pipes with one large, six-foot-high by six-foot-wide drainage pipe, changed the course of Hammond Creek, and directed Hammond Creek straight into the six-foot-high by six-foot-wide drainage pipe—so that the creek ran directly into the Yousts' pasture field.

During cross-examination, Mr. Keck also testified that: "[t]he pond is actually on the lowest lying area of [Appellant's] property;" he did not know whether the pond existed before the Dam was constructed; he did not know the original, natural course of Hammond Creek; and, when Appellant re-channeled Hammond Creek in 2009, Appellant built a "stream channel drainage area [that] was 100% artificially created." *Id.* at 90–95.

During the Yousts' rebuttal, the Yousts presented the testimony of Eugene Sargent. As explained above, Mr. Sargent originally conveyed the land to both Appellant and the Yousts; specifically, in 1992, Mr. Sargent severed his unitary parcel of land and sold part of this land to Appellant

---

**6.** As Dr. Emerson testified, there are many reasons why a landowner might wish to remove a dam on their property:

> These reasons include, but are not limited to, removing the liability of owning a dam, reducing the downstream hazard potential of a dam. When you impound water, as you've heard throughout the testimony, it does want to flow downhill and the only thing that's preventing it from doing that is the dam and that is inherently potentially a dangerous situation. You may want to remove the dam to reduce flooding. You may want to remove a dam to improve [in-stream] habitat and water quality of the receiving water body. You may want to remove the dam to provide unimpeded access for live organisms, specifically fish, that require access from one portion of a stream or river to another portion to spawn.
>
> So, from an environmental standpoint there are numerous reasons, but [ ] largely is the elimination of the hazard potential of that dam.

N.T. Trial, 8/1/12, at 326.

and part of this land to the Yousts. N.T. Trial, 8/3/12, at 193–194. Mr. Sargent testified that he owned the unitary parcel from 1976 until 1992 and, during this time, Mr. Sargent raised dairy cows on the land. *Id.* at 194. Mr. Sargent testified that, when he owned the land, he pastured his cows where the Yousts currently pasture their animals and he watered his cows with both the Hammond Creek water that exited the Dam and with the various wells that were found throughout the portion of the property that he later sold to the Yousts. *Id.* at 195 and 197–198. Moreover, Mr. Sargent testified that, when he pastured his cows near the Dam, Hammond Creek was always flowing and the creek never ran dry. *Id.* at 195.

Following closing argument, the trial court instructed the jury on the law. With respect to the law of nuisance, the trial court instructed the jury:

> So in this case ... [the Yousts] are alleging that ... [Appellant's] failure to maintain, manage[ ] the storm water runoff, and in the interruption of the regular source of water in what's been described as a stream by the modification of the pipes and the installation of this six-foot culvert they alleged that has created a private nuisance to them.
>
> . . .
>
> Now, we've heard much about the flow of water and all of that and that is of course[ ] one of the things you're going to be thinking about in deliberating. I would tell you some general principles

about water flow and, again, the attorneys have touched upon this and the evidence has as well. In general in Pennsylvania the law provides that in this case [Appellant] as the upstream or the dominant landowner has a right to discharge water onto the [ ] downstream, or the [servient], landowner in this case, [who are the Yousts. The] domina[nt] owner is able to do that, but the dominant owner is not entitled to increase or change the concentration of the water by artificial means increasing the flow and turn the water from what would be a natural channel to an unnatural channel where the water would not normally flow.

> Now, what is natural and reasonable depends upon the facts of every case and it is ordinarily—and it will be for your determination as jurors to decide what that is.
>
> So, again, while the property owner, such as [Appellant], does have a right to have surface waters that run across their property discharge through a natural watercourse onto the [Yousts'] property, a property owner is not entitled to channel and discharge an unnecessary or an unreasonable amount of water, storm water, onto the property of another person.

*Id.* at 253–254.

Neither party objected to the trial court's characterization of the water as "surface" or "storm" water.[7] *Id.*

---

7. Although the trial court defined the water as "surface" water, the trial court also used the term "watercourse" to describe the channel within which the surface water flowed. As we have earlier explained, the second Restatement of Torts differentiates between "surface water" and a "watercourse." Nevertheless, courts commonly (and generically) refer to surface water channels as "watercourses." As the American Law Report has stated:

In many instances, in dealing with the right of an upper owner to have a depression or drainway kept free from obstructions or with the right of such an owner to drain off surface water therein, the courts use the expression "watercourse," or "natural watercourse." As pointed out by Farnham in his work on Waters ... this confusi[on] of natural drainage channels with watercourses, to which the rules governing the

At the conclusion of trial, the jury found as follows: 1) when Appellant removed the Dam in 2009, Appellant trespassed upon the Yousts' land; 2) Appellant has caused a private nuisance on the Yousts' land; and, 3) Appellant did not interfere with the Yousts' express travel easement. N.T. Trial, 8/3/12, at 262. The jury then awarded the Yousts $35,000.00 in damages for the trespass and nuisance claims. *Id.* Further, after discharging the jury, the trial court rendered its decision on the Yousts' interference with easement implied from prior use, interference with easement by necessity, preliminary injunction, and permanent injunction counts. The trial court found in favor of Appellant and against the Yousts on all counts. *Id.* at 263.

The Yousts and Appellant filed timely post-trial motions. Within the Yousts' post-trial motion, the Yousts requested that the trial court reconsider its decision and find in their favor on the interference with easement by necessity, preliminary injunction, and permanent injunction counts. The Yousts' Post–Trial Motion, 8/10/12, at 1–5. Of importance to this appeal, the Yousts post-trial motion **did not** request that the trial court reconsider the portion of its decision, wherein the trial court denied the Yousts relief on their interference with easement implied from prior use claim.[8] *See id.*

Further, with respect to the Yousts' claims for injunctive relief, the Yousts limited their post-trial motion to the claim

rights of riparian owners apply, has needlessly complicated the question of the rights of upper and lower owners with respect to surface drainage. It is submitted, however, that in most cases, where the courts use the terms "watercourse" and "natural watercourse" in connection with the obstruction or drainage of surface waters, they are thinking of watercourses in the sense of drainways or drainage channels, rather than in the sense of streams or ancient watercourses.

As has been aptly said: "The term 'watercourse' has come to have two distinct meanings; the one when referring to that watercourse in and to which riparian rights may attach, and the other when referring to that watercourse through which an upper landowner may discharge water from his land." *Thompson v. Andrews,* 39 S.D. 477, 165 N.W. 9 (1917).

P.M.D., Annotation, *What constitutes natural drainway or watercourse for flow of surface water,* 81 A.L.R. 262 (1932).

In the case at bar, since the trial court defined the water as "surface water," its use of the term "watercourse" could only refer to the surface water channel.

8. In relevant part, the Yousts' post-trial motion declares:

11. An implied easement by necessity is an equitable remedy that requires proof of the following elements: "(1) the titles to the

allegedly dominant and servient properties were held by one person; (2) this unity of title was severed when one of the properties was conveyed; and (3) the easement is necessary for the owner of the dominant property to use his land, with such necessity existing both at the time of the severance of the title and at the time of the exercise of the easement." *In re: Laying Out and Opening of Private Road,* 41 A.3d 163, 166 [(Pa.Cmwlth.2012)].

12. All of the requirements for an implied easement by necessity in both the [Charavoyne D]am and regular and reliable source of water flowing onto [the Yousts'] property as a result of the [D]am were met at trial. . . .

. . .

WHEREFORE, [the Yousts] request the [trial c]ourt grant them an implied easement by necessity in the [D]am and the pond area as well as the regular and orderly flow of water from the [D]am through the [Yousts'] pasture and enjoin [Appellant] from interfering with that easement.

The Yousts' Post–Trial Motion, 8/10/12, at 4–5. Hence, the Yousts limited their request for post-trial relief to their claim asserting Appellant's interference with an easement by necessity. The Yousts' post-trial motion did not raise any claim that the trial court erred in denying them relief on their claim alleging interference with an easement implied from prior use.

that the trial court erred in "denying [the Yousts'] request for an injunction requiring [Appellant] to abate the nuisance that the jury found." *Id.* at 3 (emphasis added).

Within Appellant's post-trial motion, Appellant requested that the trial court grant a judgment notwithstanding the verdict ("JNOV") in its favor on the jury's finding of private nuisance. Specifically, Appellant claimed, it could not be liable for nuisance because "it was both reasonable and necessary for [Appellant] to alter the [D]am [and Appellant] did not divert the water from its natural channel." Appellant's Post–Trial Motion, 8/20/12, at 3.

On December 17, 2012, the trial court entered separate orders, denying Appellant's post-trial motion and granting, in part, the Yousts' post-trial motion. The latter order reads:

> AND NOW, this 17th day of December, 2012, upon further consideration of the Motions for Post–Trial Relief filed by both parties, the court hereby GRANTS [the Yousts'] Motion in part;
>
> The court finds that [the Yousts] established at trial the elements necessary to grant them an implied easement by necessity in the dam and the pond area as well as the regular and orderly flow of water from the dam into [the Yousts'] pasture;
>
> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that a Permanent Injunction be GRANTED in favor of [the Yousts];
>
> [Appellant] is hereby ORDERED to abate the nuisance of the periodic flooding of [the Yousts'] property in a manner permitted by DEP regulations;

> Alterations to accomplish the nuisance abatement shall be performed within [90] days from today's date.

Trial Court Order, 12/17/12, at 1.

Appellant filed a timely motion for reconsideration and requested that the trial court reconsider its December 17, 2012 order. In response, on January 15, 2013, the trial court vacated its December 17, 2012 order and scheduled oral argument on Appellant's motion. Trial Court Order, 1/15/13, at 1. Following oral argument, the trial court entered an order on May 20, 2013, which essentially reinstated the December 17, 2012 order. Trial Court Order, 5/20/13, at 1. Judgment was entered on July 10, 2013 and Appellant filed a timely notice of appeal.

Appellant now raises the following claims on appeal: [9]

> Did the [trial] court err in denying Appellant's Motion for Post–Trial [R]elief and subsequent Motion for Reconsideration and to Vacate the Order of December 17, 2012 concerning the jury's decision that Appellant had created a private nuisance on its property which injured [the Yousts]?
>
> Did the [trial] court err in concluding that [the Yousts] established the elements of an implied easement by necessity?
>
> Did the [trial] court err in concluding that [the Yousts] had proven a right to injunctive relief?

Appellant's Brief at 6.

Appellant first claims that the trial court erred when it denied Appellant's post-trial motion, wherein Appellant sought a JNOV with respect to the jury's determination

---

9. The trial court did not order Appellant to file a concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), and Appellant did not voluntarily file a Rule 1925(b) statement. Nevertheless, the trial court filed a Rule 1925(a) opinion in this case.

that Appellant created a private nuisance on the Yousts' property. This claim fails.

As we have explained,

[a] JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our [standard] of review is [de novo]. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the [fact finder] could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

*Am. Future Sys., Inc. v. BBB*, 872 A.2d 1202, 1215 (Pa.Super.2005) (internal quotations and citations omitted).

Further, under our caselaw, "to preserve the right to request a JNOV post-trial, a litigant must first request a binding charge to the jury or move for [a] directed verdict [or a compulsory non-suit] at trial." *Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 570 (Pa.Super.2006) (internal quotations and corrections omitted).[10]

Our Supreme Court has defined the term "nuisance" in the following manner:

The term nuisance signifies in law such a use of property or such a course of conduct as, irrespective of actual trespass against others or of malicious or actual criminal intent, transgresses the just restrictions upon use or conduct which the proximity of other persons or property in civilized communities imposes upon what would otherwise be rightful freedom. In legal phraseology, the term "nuisance" is applied to that class of wrongs that arise from the unreasonable, unwarrantable, or unlawful use by a person of his own property, real or personal, or from his own improper, [indecent], or unlawful personal conduct, working an obstruction or injury to a right of another, or of the public, and producing such material annoyance, inconvenience, discomfort or hurt that the law will presume a consequent damage. Nuisance is distinguishable from [trespass]. The distinction between trespass and nuisance consists in the former being a direct infringement of one's right of property, while, in the latter, the infringement is the result of an act which is not wrongful in itself, but only in the consequences which may flow from it.

*Kramer v. Pittsburgh Coal Co.*, 341 Pa. 379, 19 A.2d 362, 363 (1941) (internal citations, quotations, and corrections omitted).

A nuisance may be public, private, or both public and private. *See Pa. Soc'y for the Prevention of Cruelty to Animals v. Bravo Enters., Inc.*, 428 Pa. 350, 237 A.2d 342, 348 (1968). As our Supreme Court has declared, "[t]he difference between a public and a private nuisance does

10. In the case at bar, Appellant "preserve[d] its] right to request a JNOV post-trial" by moving for a compulsory non-suit at trial and asserting that the Yousts had failed to satisfy their burden of production of establishing a nuisance. N.T. Trial, 8/1/12, at 316–317.

not depend upon the nature of the thing done, but upon the question of whether it affects the general public or merely some private individual or individuals." *Phillips v. Donaldson,* 269 Pa. 244, 112 A. 236, 237–238 (1920). Nevertheless, the second Restatement of Torts specifically defines a private nuisance as "a nontrespassory invasion of another's interest in the private use and enjoyment of land." Restatement (Second) of Torts § 821D.

The Restatement (Second) of Torts § 822 provides the general rule as to who may be liable for a private nuisance. The section declares:

One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either

(a) intentional and unreasonable, or

(b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless con-

duct, or for abnormally dangerous conditions or activities.

Restatement (Second) of Torts § 822.[11]

An intentional invasion is defined in the following manner:

An invasion of another's interest in the use and enjoyment of land or an interference with the public right, is intentional if the actor

(a) acts for the purpose of causing it, or

(b) knows that it is resulting or is substantially certain to result from his conduct.

Restatement (Second) of Torts § 825.[12]

The term "unreasonable" is defined as:

An intentional invasion of another's interest in the use and enjoyment of land is unreasonable if

(a) the gravity of the harm outweighs the utility of the actor's conduct, or

---

**11.** In *Waschak v. Moffat,* 379 Pa. 441, 109 A.2d 310 (1954), our Supreme Court adopted Restatement (First) of Torts § 822 and held that the section correctly restated the common law of Pennsylvania. Section 822 of the first Restatement of Torts provides the general rule for liability as to a private nuisance. It declares:

The actor is liable in an action for damages for a nontrespassory invasion of another's interest in the private use and enjoyment of land if,
(a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and
(b) the invasion is substantial; and
(c) the actor's conduct is a legal cause of the invasion; and
(d) the invasion is either
(i) intentional and unreasonable; or
(ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct.
Restatement (First) of Torts § 822.
In all substantive respects, Section 822 of the first Restatement was reenacted in the Restatement (Second) of Torts. *See* Restate-

ment (Second) of Torts §§ 821D, 821E, 821F, and 822. Moreover, Section 822 of the second Restatement is subsumed within Section 822 of the first Restatement. Therefore, as this Court has previously held, if given the opportunity, our Supreme Court would conclude that Restatement (Second) of Torts § 822 correctly restates the common law of Pennsylvania. *Kembel v. Schlegel,* 329 Pa.Super. 159, 478 A.2d 11, 14 (1984).

**12.** In *Burr v. Adam Eidemiller, Inc.,* 386 Pa. 416, 126 A.2d 403 (1956), our Supreme Court declared that Restatement (First) of Torts § 825 (concerning intentional invasions in the use and enjoyment of land) correctly restated the common law of Pennsylvania. *Burr,* 126 A.2d at 407. As is relevant to the case at bar, Section 825 of the first Restatement of Torts is identical to Section 825 of the second Restatement of Torts. Therefore, as is relevant to the case at bar, the Pennsylvania Supreme Court has held that Restatement (Second) of Torts § 825 correctly restates the law of Pennsylvania.

(b) the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible.

Restatement (Second) of Torts § 826.

■ Further, in Pennsylvania, specialized rules have been developed as to when an upper landowner may be liable for the effects of surface water running off its property.[13] Our Supreme Court has held that, "[b]ecause water is descendible by nature, the owner of a dominant or superior heritage has an easement in the servient or inferior tenement for the discharge of all waters which by nature rise in or flow or fall upon the superior." *Chamberlin v. Ciaffoni*, 373 Pa. 430, 96 A.2d 140, 142 (1953), *quoting Kauffman v. Griesemer*, 26 Pa. 407 (Pa.1856). Therefore, "an owner of higher land [is] under no liability for damages to an owner of lower land caused by water which naturally flows from the one level to the other." *Chamberlin*, 96 A.2d at 142.

■ Notwithstanding the above, "[t]he right of the upper landowner to discharge water on the lower lands of his neighbor is, in general, a right of flowage only, in the natural ways and natural quantities." *Pfeiffer v. Brown*, 165 Pa. 267, 30 A. 844 (1895). Thus, if the upper landowner "alters the natural conditions so as to change the course of the water, or concen-

trate[s] it at a particular point, or by artificial means [ ] increase[s] its volume, he becomes liable for any injury caused thereby." *Id.* In other words, it is "only where the water is diverted from its natural channel or where it is unreasonably or unnecessarily changed in quantity or quality has the lower owner received a legal injury." *Lucas v. Ford*, 363 Pa. 153, 69 A.2d 114, 116 (1949).

In this case, with respect to the Yousts' private nuisance claim, the trial court instructed the jury:

> [the Yousts] are alleging that ... [Appellant's] failure to maintain, manage[ ] the storm water runoff, and in the interruption of the regular source of water in what's been described as a stream by the modification of the pipes and the installation of this six-foot culvert they alleged that has created a private nuisance to them.

N.T. Trial, 8/3/12, at 253–254.

Moreover, the trial court instructed the jury on the law regarding the discharge of surface water, including that Appellant "does have a right to have surface waters that run across [its] property discharge through a natural watercourse onto the [Yousts'] property," but that Appellant did not have a right to "turn the water from what would be a natural channel to an unnatural channel where the water would not normally flow" or to "increase or change the concentration of the water by

---

**13.** As explained above, the trial court instructed the jury that the water flowing over Appellant's land was "surface water"—and that the Yousts were claiming that Appellant had improperly diverted surface water onto their land. N.T. Trial, 8/3/12, at 253–254. The instruction was thus consistent with Dr. Crago's trial testimony, wherein Dr. Crago testified that (prior to the year–2009 construction) the headwater of Hammond Creek was the pond—and the water that flowed over Appellant's land and into the pond was simply "storm water runoff from ... the watershed." N.T. Trial, 7/31/12, at 172–173. Moreover, on appeal, Appellant has limited its discussion to "the law of surface waters." Appellant's Brief at 15–16. Therefore, within this opinion, we must assume that the water traveling across Appellant's land was surface water and that, when Appellant diverted the channel away from the pond and straight onto the Yousts' land, Appellant was diverting surface water onto the Yousts' land.

artificial means." *Id.* The trial court also instructed the jury that the questions of what is a "natural channel" and what is "reasonable" were issues of fact that were to be determined by the jury. *Id.*

After receiving these instructions, the jury found in favor of the Yousts and concluded that Appellant was liable for creating a private nuisance on the Yousts' land. While Appellant now argues that it is entitled to a JNOV on this issue, it is clear that Appellant's argument fails.

■ Here, the evidence was sufficient to support the jury's verdict because there was sufficient evidence to support the finding that Appellant diverted the surface water from its natural course and "turn[ed] it by unnatural channels where it is not wont to flow"—and, in so doing, caused a private nuisance upon the Yousts' land. *See Markle v. Grothe,* 102 Pa.Super. 90, 156 A. 585, 586 (1931). Indeed, the evidence at trial demonstrated that—prior to 2009—the surface water drained into Appellant's property and then flowed, in a channel, into the pond that existed on Appellant's property. N.T. Trial, 7/30/12, at 30–31 and 41–42. From there, the surface water mixed with other water in the pond and the water then drained into the Yousts' property through the Dam overflow pipes. *Id.*

It is uncontroverted that, in 2009, Appellant drained the pond, destroyed the 100–year–old Dam, and re-banked the pond approximately 20 feet away from its prior location. *Id.* at 46. Appellant then created an artificial rock-lined bed, which changed the direction of the surface water channel. *Id.* at 44–48. In particular, Appellant channeled the surface water away from the pond and directly into the Yousts' property through the newly installed six-foot-high by six-foot-wide drainage pipe. *Id.* Moreover, although Appellant's witness, Dr. Clay Emerson, opined that the year–2009 construction restored the area to its "natural" condition, Appellant's president and CEO testified that: "[t]he pond is actually on the lowest lying area of [Appellant's] property;" he did not know whether the pond existed before the Dam was constructed; and, he did not know the original, natural course of the channel. N.T. Trial, 8/2/12, at 90–95.

The above evidence is sufficient to support the jury's conclusion that Appellant's year–2009 construction created a private nuisance on the Yousts' land, as there is sufficient evidence for a fact-finder to conclude that Appellant's year–2009 construction "diverted the surface water from its natural channel by artificial means" and caused an "unnatural" discharge of surface water onto the Yousts' land. *See Shamnoski v. PG Energy,* 579 Pa. 652, 858 A.2d 589, 599 (2004). Certainly, from the above evidence, the jury was entitled to conclude that the pond had always existed upon Appellant's land and that the surface water channel had always drained into the pond. *See Markle,* 156 A. at 586 ("[w]hat is a natural and reasonable use depends upon the facts in each case, and is[ ] ordinarily for the determination of the chancellor, or the jury, as the case may be"); N.T. Trial, 8/3/12, at 193–194 (trial court instructed the jury that "what is natural and reasonable depends upon the facts of every case and . . . it will be for your determination as jurors to decide what that is"). Thus, the jury was entitled to conclude that, when Appellant re-banked the pond and diverted the surface water channel away from the pond and directly through to the Yousts' property, Appellant had diverted the water from its natural channel by artificial means. Therefore, Appellant's first claim on appeal fails.

For Appellant's second issue on appeal, Appellant claims that the trial court erred in concluding that the Yousts had proven

that they were entitled to an easement by necessity in the Dam, the pond, and "the regular and orderly flow of water from the [D]am into the Yousts' pasture."[14] Appellant's Brief at 20. We agree.

 As this Court has held:

The three fundamental requirements for an easement by necessity to arise are the following:

1) The titles to the alleged dominant and servient properties must have been held by one person[;]

2) This unity of title must have been severed by a conveyance of one of the tracts[;]

3) The easement must be necessary in order for the owner of the dominant tenement to use his land, with the necessity existing both at the time of the severance of title and at the time of the exercise of the easement.

An easement by necessity is always of strict necessity. An easement by necessity never exists as a mere matter of convenience.... [A]n easement by necessity is extinguished when the necessity from which it resulted ceases to exist. *Phillippi v. Knotter*, 748 A.2d 757, 760 (Pa.Super.2000) (internal quotations and citations omitted) (internal emphasis omitted); *see also Ogden v. Grove*, 38 Pa. 487 (Pa.1861) ("[t]he right of way from necessi-

14. As explained above, the trial court initially found against the Yousts on their "interference with easement implied from prior use" and "interference with easement by necessity" claims. However, following trial, the Yousts filed a post-trial motion and claimed that the trial court erred in denying them relief on their **interference with easement by necessity** claim. The Yousts' Post–Trial Motion, 8/10/12, at 4–5. Importantly, within the Yousts' post-trial motion, the Yousts **did not** claim that the trial court erred in denying them relief on their interference with easement implied from prior use claim. *Id.*

On December 17, 2012, the trial court entered an order granting, in part, the Yousts' post-trial motion. As is relevant to the current issue, the trial court's December 17, 2012 order declares: "[t]he court finds that [the Yousts] established at trial the elements necessary to grant them an **implied easement by necessity** in the [D]am and the pond area as well as the regular and orderly flow of water from the [D]am into [the Yousts'] pasture." Trial Court Order, 12/17/12, at 1. The trial court's December 17, 2012 order thus **did not grant** (indeed, the order **could not have granted**) the Yousts relief on their interference with easement implied from prior use claim. Nevertheless, the trial court's Rule 1925(a) opinion and the parties' briefs to this Court all state or imply that the trial court granted the Yousts post-trial relief with respect to **both** the Yousts' "interference with easement implied from prior use" and "interference with

easement by necessity" claims. *See* Trial Court Opinion, 8/16/13, at 5; Appellant's Brief at 8; The Yousts' Brief at 18–21. All such statements or implications are incorrect and they plainly contradict the clear language that is contained in the trial court's December 17, 2012 order. Certainly, a trial court speaks through its **orders**—not through advisory, Rule 1925(a) opinions, which are issued only for the benefit of appellate review. *See Commonwealth v. Lobiondo*, 501 Pa. 599, 462 A.2d 662, 665 n. 4 (1983) (a trial court's Rule 1925(a) opinion "is intended as an aid to the reviewing appellate court and cannot alter a previously entered verdict"); *Commonwealth v. Burkett*, 830 A.2d 1034, 1035 n. 2 (Pa.Super.2003) ("[w]hile a trial court is required to explain its reasoning when faced with an issue raised in a Rule 1925(b) statement (and will sometimes indicate that an issue is waived for not having been properly raised and preserved by appropriate objection or motion), the trial court may not enter a dispositional order in such a procedural posture"). Therefore, in this case, since the Yousts' post trial motion raised a claim of error only as to their interference with easement by necessity claim, and the trial court found that the Yousts were entitled to relief on their interference with easement by necessity claim and **not** their interference with easement implied from prior use claim—on appeal, we will only consider Appellant's claim that the trial court erred when it granted the Yousts relief on their interference with easement by necessity claim.

ty over the land of another . . . is always of strict necessity. . . . It never exists[ ] when a man can get to his own property through his own land. . . . Convenience is no foundation for the claim, nor is actual detriment to the possession of the claimant resulting from a necessity of a way through his own property, any reason to claim it through that of a neighbor").

Initially, we have scoured the appellate caselaw from this Commonwealth and have discovered no case that has recognized an easement by necessity for any other purpose than for ingress to a piece of land and egress from the piece of land.[15] *See Bodman v. Bodman,* 456 Pa. 412, 321 A.2d 910, 912 (1974) ("[a]n easement by necessity may be created when after severance from adjoining property, a piece of land is without access to a public highway") *Phillippi,* 748 A.2d at 760 ("[c]laiming the existence of an easement by necessity contemplates a situation in which a parcel of land is landlocked"); *see also Maioriello v. Arlotta,* 364 Pa. 557, 73 A.2d 374, 375 (1950) ("[the Pennsylvania Supreme Court] early stated that an easement to light and air may be implied because of necessity[ ] *Rennyson's Appeal,* [94 Pa. 147 (Pa.1880)]. However, no case has been cited, and our research has revealed none, wherein such an implied easement has been decreed"). Nevertheless, we need not determine whether the doctrine of easement by necessity has a broader application than ingress and egress because—even if the doctrine were potentially applicable in this case—the Yousts failed to prove necessity.

Assuming, *arguendo,* that an easement by necessity may potentially be recognized over dams, ponds, and surface water flow, the first two elements for an easement by necessity have been met in this case. This is because "[t]he titles to the alleged dominant and servient properties [were] held by one person" (the Sargents) and the "unity of title [was] severed by a conveyance of one of the tracts" (to Appellant). *Phillippi,* 748 A.2d at 760. Thus, the only issue is whether, at trial, the Yousts established the final element: that the easement in the Dam, the pond, and "the regular and orderly flow of water from the [D]am into the Yousts' pasture" is "necessary in order for the [Yousts] to use [their] land, with the necessity existing both at the time of the severance of title and at the time of the exercise of the easement." *Id.*

At trial, the Yousts claimed that they were entitled to an easement by necessity in the Dam, the pond, and "the regular and orderly flow of water from the [D]am into the Yousts' pasture" because they require a regular, orderly flow of water that their livestock can drink and because they also need to ensure that their pasture field is not subject to flooding, erosion, and other damage. *See* The Yousts' Post–Trial Motion, 8/10/12, at 4–5. Further, the Yousts claimed that these same necessities existed when the Sargents sold the portion of their land to Appellant and severed their title to the unitary parcel of land. As the Yousts argued, at the time of the severance, the Sargents retained title to the parcel of land that the Yousts currently own—and, at the time of severance, the Sargents watered their livestock with the "regular and orderly flow of water from the [D]am" and the Sargents pastured their livestock in the same field that the Yousts used. *Id.*

The trial court agreed with the Yousts and held that the Yousts had proven that they were entitled to an easement by necessity in the Dam, the pond, and

---

**15.** As noted above, the Yousts have an express easement for ingress and egress across Appellant's land.

"the regular and orderly flow of water from the [D]am into the Yousts' pasture." Trial Court Order, 12/17/12, at 1. In so holding, the trial court, in effect, declared that Appellant was required to rebuild a specific artificial structure on Appellant's own land—and maintain that artificial structure—to alter the natural conditions of the land, for the Yousts' benefit. This was error.

Initially, with respect to the "regular" flow of water, the Yousts did not prove that an easement in the Dam, the pond, or "the regular ... flow of water from the [D]am into the Yousts' pasture" was necessary to water the livestock either at the time the Sargents severed their title to the land or now.

During Mr. Sargent's testimony, Mr. Sargent testified that, after he sold the parcel of his land to Appellant, he pastured his dairy cows in the land that the Yousts used for pasture. N.T. Trial, 8/3/12, at 193–195. However, Mr. Sargent never testified that a "regular ... flow of water from the [D]am into [his] pasture" was necessary to water his cows. *See id.* at 193–200. Indeed, while Mr. Sargent testified that his dairy cows drank the water that flowed from the Dam, Mr. Sargent also testified that he watered his cows with the various wells that existed on his land—and that he was able to water all of his livestock with the well water. *Id.* at 197. Thus, it is uncontroverted that, at the time of severance, it was not necessary for Mr. Sargent to receive a "regular ... flow of water from the [D]am into [the] pasture" to water his cows, as Mr. Sargent was able to (and did) water his livestock with the well water.

Further, Denny Youst admitted that, in 2012, the Yousts installed water troughs in the pasture field and that—even when the creek ran dry—he was able to water his livestock with the water troughs. Denny Youst testified:

Q: Alright. It wasn't until this July that you put a ... trough in the pasture; is that right?

A: I'd have to ask my dad. He took it down, but it was this year. This year was dry, dried it up pretty bad.

Q: Alright. This year, just so we're clear, is 2012 you mean?

A: Yeah, we're in 2012, yeah, right.

Q: And where does the water that fills that trough come from?

A: From that—I don't know if you'd remember that little building on the film that was there coming in our—in the right-of-way out by [Route] 328; right there, that's a pump house.

Q: Okay. So, I assume there's a well there?

A: Yes.

Q: Okay. And there are other wells on the property; right?

A: Right.

Q: There's one well in the barn; is that right?

A: Yes.

Q: And then there's another well in the Dairy Bar; is that—

A: —right.

N.T. Trial, 7/31/12, at 123–124; *see also* N.T. Trial, 7/30/12, at 30 (Denny Youst testified: "[the livestock] get their water from the creek. They used to, but now since it's been dry and the [creek's] dried up we've been having to use a cattle trough and we run water down to them that way").

Since Denny Youst admitted that the Yousts are currently able to water their animals by using water troughs, the Yousts did not prove that a "regular ... flow of water from the [D]am into the Yousts' pasture" was necessary for the

Yousts to water their animals. Therefore, the Yousts did not prove that an easement in the Dam, the pond, or "the regular ... flow of water from the [D]am into the Yousts' pasture" was necessary either at the time the Sargents severed their title to the land or now.

With respect to the "orderly" flow of water onto the Yousts' land, the Yousts argue:

> the nature of the necessity of the easement in the orderly flow of water from [the] pond dam [ ] exists as a source of water for cattle, but also as an essential flood control measure required to prevent accelerated erosion and flooding in the pasture. This nature is well evidenced by numerous pictures introduced into evidence at trial, and by the testimony of [the] Yousts and [Mr.] Sargent. Quite simply, the pasture is unusable for cattle for feed and exercise without the water supply and flooding and erosion control features of the pond dam. This is strict necessity in its purest form, and it demonstrates that the trial court's finding of an easement by necessity was well supported by the evidence.

The Yousts' Brief at 21 (internal emphasis omitted).

However, in this case, Denny Youst testified that the Yousts are able to pasture and exercise their animals on other fields on their property. Indeed, Denny Youst testified that, after their normal pasture field began to suffer from intermittent flooding and drought, the Yousts "opened up the two big fields that [they] used to cut hay off of" and the Yousts converted those hay fields into their new pasture field. N.T. Trial, 7/31/12, at 63–64. Thus, for the Yousts to use their land as a farm, it is not necessary that the Yousts pasture their animals on the particular piece of land that they formerly used as a pasture.

Hence, even if the Yousts' claim were potentially cognizable, it would fail, as the Yousts failed to prove that an easement in the Dam, the pond, or "the regular and orderly flow of water from the [D]am into the Yousts' pasture" was "necessary in order for the [Yousts] to use [their] land, with the necessity existing both at the time of the severance of title and at the time of the exercise of the easement." *Phillippi*, 748 A.2d at 760. Instead, the Yousts proved only that access to "the regular and orderly flow of water from the [D]am into the Yousts' pasture" would be **convenient** for the Yousts to use their land in the manner they wish. However, "[c]onvenience is no foundation for the claim" and the trial court thus erred in granting the Yousts relief on their "interference with easement by necessity" claim. *Ogden*, 38 Pa. at 487.

Finally, Appellant claims that the trial court erred in granting the Yousts a permanent injunction against Appellant, requiring Appellant "to abate the nuisance of the periodic flooding of [the Yousts'] property in a manner permitted by DEP regulations." Appellant's Brief at 27. This claim fails.

 As we have held:

Our standard of review in addressing whether a trial court erred in granting a permanent injunction is well-settled.

In order to establish a claim for a permanent injunction, the party must establish his or her clear right to relief. However, unlike a claim for a preliminary injunction, the party need not establish either irreparable harm or immediate relief and a court may issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law. Additionally, when reviewing the grant or denial of a final or permanent injunction, an appellate court's review is limited to deter-

mining whether the trial court committed an error of law.

*J.C. Ehrlich Co. v. Martin,* 979 A.2d 862, 864 (Pa.Super.2009) (internal quotations and citations omitted).

In relevant part, the trial court's order in this case reads:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that a Permanent Injunction be GRANTED in favor of [the Yousts];
>
> [Appellant] is hereby ORDERED to abate the nuisance of the periodic flooding of [the Yousts'] property in a manner permitted by DEP regulations;
>
> Alterations to accomplish the nuisance abatement shall be performed within [90] days from today's date.

Trial Court Order, 12/17/12, at 1.

█ In the case at bar, the jury concluded that Appellant caused a private nuisance on the Yousts' land. Undoubtedly, Appellant must abate this nuisance; and, since the nuisance is continuing, the trial court possessed the authority to issue a permanent injunction and order Appellant to "abate the nuisance." *Gardner v. Allegheny County,* 382 Pa. 88, 114 A.2d 491, 498 (1955) ("[i]t is hornbook law that a Court of Equity possesses jurisdiction to ... enjoin a nuisance"). Therefore, the trial court did not err when it granted the Yousts a permanent injunction against Appellant, requiring that Appellant **"abate the nuisance** of the periodic flooding of [the Yousts'] property."** Trial Court Order, 12/17/12, at 1 (emphasis added).

Within Appellant's brief to this Court, Appellant looks beyond the language contained in the trial court's order—and Appellant focuses upon the language contained in the trial court's **advisory Rule 1925(a) opinion.** In particular, Appellant focuses upon the portion of the trial court's Rule 1925(a) opinion, wherein the trial court attempted to explain the reason why it granted the Yousts a permanent injunction. As Appellant notes, the trial court's Rule 1925(a) opinion declares that the trial court "found it necessary to enjoin [Appellant] from creating further damage and/or drought conditions **which interfere with the [Yousts'] quiet enjoyment of their easement in access to the water.**" Trial Court Opinion, 8/16/13, at 9 (emphasis added). According to Appellant, the trial court's reasoning makes it appear as though the trial court did not "grant[ ] injunctive relief on nuisance grounds but rather related to the [purported] implied easement by necessity." Appellant's Brief at 28. Appellant argues that, since the Yousts were not entitled to an easement by necessity, the trial court erred when it granted the Yousts injunctive relief. *Id.* at 27–37.

█ Although we understand Appellant's position, we repeat that a trial court can only speak through its **orders**—and that any reasoning contained in a Rule 1925(a) opinion is advisory, and for the benefit of this Court only. *Lobiondo,* 462 A.2d at 665 n. 4; *Burkett,* 830 A.2d at 1035 n. 2. In the case at bar, the trial court's **order** is clear: the trial court granted the Yousts a permanent injunction against Appellant, requiring Appellant **"to abate the nuisance** of the periodic flooding of [the Yousts'] property."** Trial Court Order, 12/17/12, at 1 (emphasis added). As explained above, this order is proper; and, since the trial court **did not** grant the Yousts injunctive relief on their "easement by necessity" claim, Appellant's claim on appeal fails.[16]

---

**16.** We note that, had the trial court granted the Yousts' injunctive relief on their easement by necessity claim, we would have simply vacated that portion of the judgment.

Judgment affirmed in part, vacated in part, and remanded. Jurisdiction relinquished.