J-A23043-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MARK J. ROTH AND MICHELLE A. ROTH, HUSBAND AND WIFE, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : | |
| v. | : | |
| RICHARD B. MARSHALL, BRYCE C. MARSHALL AND RICHARD B. MARSHALL, II | : | No. 563 WDA 2019 |

Appeal from the Judgment Entered April 3, 2019
in the Court of Common Pleas of Blair County
Civil Division at No(s): 2017 GN 3490

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED NOVEMBER 21, 2019**

Mark J. Roth and Michelle A. Roth, husband and wife (collectively, "the Roths"), appeal from the judgment entered against them and in favor of Richard B. Marshall, Bryce C. Marshall and Richard B. Marshall, II (collectively, the Marshalls"). We affirm.

The trial court set forth the facts underlying the instant appeal in its April 3, 2019, Opinion, which we adopt for the purpose of this appeal. ***See*** Trial Court Opinion, 4/3/19, at 3-26.

On December 15, 2017, the Roths filed a Complaint for Injunctive Relief, alleging that the Marshalls had interfered with the flow of water, which ran through a pipe, onto the Roths' property. The Marshalls filed an Answer, New Matter and Counterclaim. Following a non-jury trial, the trial court found in

favor of the Marshalls and against the Roths. The Roths filed Post-Trial Motions, which the trial court denied. After the entry of Judgment, the Roths filed the instant timely appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

The Roths present the following claims for our review:

I.     Whether the [trial] court erred by failing to enforce [the Roths'] water rights under the deed of November 16, 1927, which prohibited the grantors, their successors and assigns, from diverting the stream of water flowing to the lands conveyed under the deed?

II.    Whether the [trial] court erred by failing to find that [the Roths] were entitled to an injunction as a matter of law, as the enforcement of a restrictive covenant cannot be compensated by monetary damages[,] and the [Roths] had otherwise satisfied the requirements for injunctive relief?

***See*** Brief for Appellant at 4.

We keep in mind the applicable standard of review:

In equity matters, appellate review is based on a determination by the appellate court of such questions as whether (1) sufficient evidence supports the findings of the judge; (2) the factual inferences and legal conclusions based on those findings are correct; and (3) there has been an abuse of discretion or an error of law. Generally, in an appeal from a trial court sitting in equity, the standard of review is rigorous. The function of this Court on an appeal from an adjudication in equity is not to substitute its view for that of the lower tribunal; our task is rather to determine whether a judicial mind, on due consideration of all of the evidence, as a whole, could reasonably have reached the conclusion of that tribunal.

***Omicron Sys., Inc. v. Weiner***, 860 A.2d 554, 557-58 (Pa. Super. 2004) (citation and internal quotation marks omitted). Moreover, we are "bound by the trial court's determination concerning the credibility of witnesses and

weight to be accorded the evidence." *Marchetti v. Karpowick*, 667 A.2d 724, 726 (Pa. Super. 1995) (citation omitted).

"[W]hen reviewing the grant or denial of a final or permanent injunction, an appellate court's review is limited to determining whether the trial court committed an error of law." *Buffalo Twp. v. Jones*, 813 A.2d 659, 663-64 (Pa. 2002).

> Ultimately, the grant or denial of a permanent injunction will turn on whether the trial court properly found that the party seeking the injunction established a clear right to relief as a matter of law. Accordingly, … appellate review in these cases is whether the lower court committed an error of law in granting or denying the permanent injunction. Our standard of review for a question of law is *de novo*. Our scope of review is plenary.

*Id.* at 664 n.4 (citations omitted).

The Roths first claim that the trial court erred by failing to enforce their water rights, as described under a November 16, 1927, deed ("the 1927 Deed"). Brief for Appellant at 12. The Roths assert that the 1927 Deed prohibited the grantors, their successors and assigns from diverting a stream of water flowing to the lands conveyed under the deed, including the property that is now theirs. *Id.* The Roths argue that the lack of the covenant in their own deed does not defeat their rights, as their rights were previously recorded in the chain of title. *Id.* at 12-14. The Roths further contend that the lack of a metes and bounds discription does not defeat their claim, as the Marshalls have never disputed the location of the stream. *Id.* at 14. In addition, the Roths take issue with the trial court's differentiation between the natural flow

of the stream, and the "manmade" portions, as the 1927 Deed made no such differentiation. *Id.* at 15. The Roths also dispute the trial court's conclusion that they merely have a license to the water from the stream. *Id.* at 16.

In its Opinion filed on October 29, 2018, the trial court determined that the 1927 Deed reserved for the *grantors*, not the grantees, the perpetual use of the water. *See* Trial Court Opinion, 10/29/18, at 21-23. The trial court further concluded that, "[b]ecause no document of record in [the Roths'] chain of title grants them any right to divert water from [the Marshalls'] property to their own for personal uses, their claim is barred by the affirmative defense of [the] Statute of Frauds, 33 P.S. § 1 …." *Id.* at 23.

In its Amended Opinion filed on April 3, 2019, the trial court additionally analyzed the language set forth in the 1927 Deed, and the evidence presented by the parties. *See* Trial Court Opinion, 4/3/19, at 26-30. Based upon this analysis, the trial court ultimately concluded that the Roths were not entitled to injunctive relief, as they "have not met their burden of establishing that they are entitled to claim any rights in the water flowing through [the Marshalls'] property and, as a result, their request for injunctive relief must be denied." *See id.* at 36. We agree with the sound reasoning of the trial court, as set forth in its October 29, 2018, and April 3, 2019 Opinions, and affirm on this basis with regard to the Roths' first claim. *See* Trial Court Opinion, 10/29/18, at 21-23; Trial Court Opinion, 4/3/19, at 26-36.

The Roths next claim that the trial court improperly failed to enforce the restrictive covenant contained in the 1927 Deed and denied them injunctive relief. Brief for Appellant at 17. The Roths assert that the Marshalls' act of terminating the flow of water to their property constituted a violation of the restrictive covenant. *Id.* However, as we agree with the trial court's determination that there was no violation of the restrictive covenant, the Roths are not entitled to relief on this claim.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/21/2019

IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

MARK J. ROTH and MICHELLE A. ROTH,  :
husband and wife,  :
             PLAINTIFFS  :  2017 GN 3490
  :
  :
  :
  :
v.  :
  :
RICHARD B. MARSHAL, BRYCE C.  :
MARSHALL and RICHARD B. MARSHALL, II,  :
           DEFENDANTS  :
  :

HON. TIMOTHY M. SULLIVAN          PRESIDING JUDGE

STEPHEN D. WICKS, ESQUIRE        COUNSEL FOR PLAINTIFFS

DANIEL L. STANTS, ESQUIRE        COUNSEL FOR DEFENDANTS

## *OPINION AND ORDER*

### *PROCEDURAL HISTORY:*

On December 15, 2017, the Plaintiffs, **Mark J. Roth** and **Michelle A. Roth**, husband and wife, (hereinafter "Roth") filed a Civil Complaint seeking injunctive relief against the Defendants, **Richard B. Marshall, Bryce C. Marshall** and **Richard B. Marshall, II**, (hereinafter "Marshall"). The parties are owners of real property situated in Tyrone Township, Blair County, Pennsylvania. Roth acquired their property by deed dated October 27, 1994, after which they built a residence, drilled a well and moved in during April of 1995. Roth claims that they continued to utilize the stream in question as a joint source of water with their well and that the Defendants, acting individually or in

1

concert, terminated the flow of water through a pipe to the Roth property on or about November 5 or 6, 2016. Roth seeks we permanently enjoin the Defendants from interfering in any manner with the water rights the Plaintiffs' claim they have secured.

The Defendants filed an Answer, New Matter and Counterclaim to the Plaintiffs' Complaint on January 11, 2018. In summary, Marshall denies that the Plaintiffs have any right to obtain water from the Defendants' property for their personal use, and seek their own order enjoining Mr. Roth from entering upon their land for any purpose, unless he has first obtained written permission.

On February 9, 2018, the Plaintiffs filed a Response to Answer, New Matter and Counterclaim. The matter proceeded to a trial by court on August 22, 2018, at which time the Plaintiffs presented the testimony of **Harry I. Albright** and **Mark J. Roth**. The Defendants presented the testimony of **Richard B. Marshall** and his son, **Bryce C. Marshall**. Several exhibits were admitted into the record on behalf of both parties. Counsel have submitted proposed Findings of Fact and Conclusions of Law and we now proceed to make the following:

## FINDINGS OF FACT:

1. The Plaintiffs are Mark J. Roth and Michelle A. Roth, husband and wife, who reside at 254 Kurtz Drive, Altoona, Pennsylvania. [Complaint and Answer, ¶1, Admitted and Trial Transcript, p. 27].

2.     Defendant, Richard B Marshall, is an individual who resides at 122 N. Bedford Street, #1, Carlisle, Pennsylvania. [Complaint and Answer, ¶2, Admitted and T., p. 76].

3.     Defendant, Bryce C. Marshall, is an individual who resides at 266 Labor Camp Road, Gardners, Pennsylvania. [Complaint and Answer, ¶3, Admitted and T., p. 120].

4.     Defendant, Richard B. Marshall II, is an individual who resides at 84 Victory Church Road, Gardners, Pennsylvania. [Compl and Answer ¶4, Admitted].

5.     The Plaintiffs are the owners of real property, which includes their residence situated in Tyrone Township, Blair County, Pennsylvania. Said parcels of ground are fully described in deed dated October 27, 1994 from Tracey D. Roth, widow, and Mark J. Roth and Michelle A. Roth, husband and wife into Mark J. Roth and Michelle A. Roth, husband and wife, as recorded in Blair County Deed Book 1246, Page 809. [Plaintiffs' and Defendants' Exhibit 2].

6.     The first parcel described in Deed Book 1246, Page 809, contains 1.341 acres, based upon a survey of Pellegrini Engineers dated April 11, 1990. This ground is described as Parcel #3 in said survey. The second deed description is for a parcel of

3

land consisting of 2.6214 acres, based upon the same Pellegrini survey and identified as Parcel #4. [Plaintiffs' Exhibit 5 and Transcript, p. 28].

7. The Defendants are owners of real property located on Kurtz Drive, Altoona, PA as more specifically set forth in a deed dated February 14, 2006 (attached as Exhibit "A" to Plaintiffs' Complaint), said parcel consisting of 57.078 acres, which is contiguous to and upstream from the aforedescribed lands of Plaintiffs. [Complaint and Answer, ¶6, Admitted].

8. The respective chain of title for the Plaintiffs was set forth in Exhibit "C" attached to Plaintiffs' Complaint, while the Defendants' predecessors in title are set forth in Exhibit "D" attached to Plaintiffs' Complaint. Those chains of title are incorporated herein and are not in dispute.

9. The land identified as Parcel #4 in the Pellegrini survey was originally acquired by Plaintiffs' predecessors in title by deed of Gail Scott Kurtz and Charles K. Kurtz, her husband, to Mary D. DeMatteis on November 16, 1927. [Plaintiffs' Exhibit 6].

10. The Kurtz to DeMatteis deed referenced above contained the following provision regarding water rights:

4

Excepting and reserving, however, from the force and operation of this deed, the perpetual right to the Grantors herein, their heirs and assigns, to use for the purpose of swimming, bathing and propagation of fish the water flowing through other lands of the Grantors, herein as well as through land herein surveyed, and by acceptance of this deed, the Grantee, for herself her heirs and assigns, release the said Grantors, their heirs and assigns from any and all liability for any contamination resulting directly or indirectly, from such usage of the stream. Grantors, their heirs and assigns, shall not divert the stream of water now flowing through lands herein conveyed.

[Complaint and Answer, ¶12, Admitted and Plaintiffs' Exhibit 6].

11. In the Plaintiffs' chain of title, the "Excepting and reserving" language set forth in the Kurtz to DeMatteis deed dated November 16, 1927 was also set forth in the following conveyances:

(a) Mary D. DeMatteis and Guy DeMatteis, her husband to Walter B. Trout and Mary Susan Trout, his wife, deed dated April 10, 1931 and recorded in Blair County Deed Book Volume 402, Page 8.

(b) Walter B. Trout and Mary Susan Trout, his wife, to Josephine C. DeMatteis, deed dated January 28, 1933 and recorded in Blair County Deed Book Volume 408, Page 698.

(c) Josephine DeMatteis to Frank A. Riccio, deed dated July 6, 1944 and recorded in Blair County Deed Book Volume 489, Page 435.

(d) Frank A. Riccio and Lucy Riccio, his wife to Carl Roth, deed dated September 13, 1948 and recorded in Blair County Deed Book Volume 592, Page 464.

(e) Ethel A. Roth, widow, et al. to Carl D. Roth and Tracey D. Roth, his wife, and Mark J. Roth, deed dated March 14, 1983 and recorded in Blair County Deed Bool Volume 1086, Page 150.

5

12. After the above conveyances, there was no further reference to the "Excepting and reserving" language in any subsequent deeds within the Plaintiffs' chain of title.

13. The stream of water referenced in the above deed was the only source of water to the Plaintiffs' lands when such lands were acquired by Carl Roth, the father of the Plaintiff, Mark J. Roth, on September 13, 1948 by deed of Frank A. Ricco and Lucy Ricco, husband and wife, dated September 13, 1948 and recorded in Blair County Deed Book Volume 592, page 464. [Plaintiffs' Exhibit 3 and T., p. 12].

14. On October 27, 1994, Tracey D. Roth (widow of Carl Roth), Mark J. Roth and Michelle A. Roth, husband and wife, deeded the subject parcels of land to Mark J. Roth and Michelle A. Roth, husband and wife, as set forth in Blair County Deed Book 1246, page 809. [Plaintiffs' Exhibit 2 and Defendants' Exhibit 2].

15. After acquiring the parcels of land in 1994, the Plaintiffs built a new home, drilled a well and moved in during April of 1995. The Plaintiffs continued to utilize the stream in question as a supplemental source of water, with the well they drilled being their primary source of water. [T., pp. 30, 40-41, 50-51 and 125].

6

16. During their case-in-chief, the Plaintiffs presented the testimony of **Harry I. Albright**, who resides at 4540 Kettle Road, Altoona, Pennsylvania. Mr. Albright has lived on this property, which is a farm, since 1947. This property has been in his family since the 1800's. Mr. Albright is 76 years of age, is a neighbor and personally knows the parties. [T., pp. 7-8].

17. Mr. Albright confirmed that he is familiar with the stream in question, which he described as the "main stream". Mr. Albright testified that the stream runs into Parcel #4 (Roth property), as well into Parcel #2 (Marshall property) as set forth in the Pellegrini Engineers Survey of April 11, 1990. [Plaintiffs' Exhibit 5, T., pp. 10-12].

18. Mr. Albright also recalled that Carl and Tracey Roth lived in the original house on the Roth property. The stream was the only source of water to Carl and Tracey Roth's home at that time. The stream runs along the boundary of Parcel #5 (Roth property). [T., pp. 12-13].

19. Mr. Albright testified that for 50 years, the stream was and still is his main source of water. Often times during the summer, when the weather was dry, there was very little water. He confirmed that Carl and Tracey Roth would also run out of water at times and would have to divert water from the stream to their property. [T., pp. 13-14].

7

20. Mr. Albright testified that it was his understanding that Richard B. Marshall planned to build a pond. There was a meeting in 1997 at Mark Roth's house involving Mark Roth, Richard B. Marshall and Mr. Albright, where they discussed putting in a pipeline to divert the water from the main stream (from the pool on the Marshall property) to the Roth property. Mr. Marshall agreed to pay for one-half (1/2) of the pipe and Mr. Albright paid for the other half. Mr. Albright confirmed that it was the parties' agreement that the pipe "could run full bore 24-7." [T., pp. 14-15].

21. In reliance upon said agreement, Mr. Albright and Cletus Steinbeiser, who had a backhoe, actually laid the waterline in the spring or summer of 1997. Most of the line went through the Marshall property. Mr. Albright and Mr. Steinbeiser buried the line underground in the winter of 1997 so that it would not freeze. [T., pp. 15-16].

22. Mr. Albright also said that they measured the amount of water that ran through the pipe and that it averaged 5 gallons per minute. [T., p. 15].

23. Mr. Albright testified that before this present dispute, that: "And from 1997 up until five or six years ago, everything - - - everybody was satisfied. Everything was going okay. And now we're where we're at." Mr. Albright later confirmed that the agreement made in 1997 was fine, adding: "Everybody for a number of years seemed to be well satisfied with it." [T., pp. 15-16].

8

24.    Mr. Albright stated that the Marshall to Roth leg of the stream was "man-made" and that the main stream did not run naturally to the Roth parcel. [T., pp. 16-18].

25.    Mr. Albright confirmed that the water to the Roth property came from the man-made stream, which originally had a pool under the waterfall on the Marshall property. He said there was a holding tank that supplied water to the Roth property and that the holding tank is not currently connected to the Plaintiffs' home, to his knowledge. [Plaintiffs' Exhibit 8; Defendants' Exhibit 1 and T., pp. 19-20].

26.    Mr. Albright confirmed that the parties' agreement in 1997 was oral and never put into writing. [T., pp. 20-21, 23].

27.    Mr. Albright also confirmed that the purpose in installing the pipe was to ensure that Tracey Roth had an ample supply of water to her property year-round, however, he also confirmed that an additional purpose was to benefit Mark & Michelle Roth, who had moved into their new house.  [T., pp. 24-25].

28.    The Plaintiff, **Mark J. Roth**, confirmed that he has lived on his property his entire life.  He was born October 27, 1967.  After he and his wife built their new home and moved in during April 1995, the old family home was torn down in 1996 (which was located on Parcel #4 on the survey by Pellegrini Engineers, Plaintiffs' Exhibit 5).  [T., pp. 27-29].

29. Mr. Roth confirmed that when he built his new home, they had a well drilled to satisfy the bank. The well serves as their primary source of water. He also drew water from the holding tank by connecting a garden hose with a shut off valve so as to not waste water. He would use this water supply to fill his well when needed. [T., pp. 30-31].

30. The stream was the only water source for the original home where Carl and Tracey Roth lived. [T., pp. 30-31].

31. Mr. Roth indicated that the stream came down off the mountain into the holding tank and that there were three lines installed, one for the Marshall home, one for his home and one for his sister, who lived on Parcel #5. [T., pp. 30-31].

32. Mr. Roth also confirmed that the 1997 meeting occurred on the deck of his new home. He indicated that he, Richard B. Marshall and Harry Albright were all present and that they came up with the idea of putting in a waterline, with Mr. Marshall paying for one-half and Mr. Albright paying for one-half. The plan was to have all the water come off the DiFolco's property, run into Marshall's pond, then back into a stream, and then over to Albright's property. Mr. Roth did not contribute financially to installation of the waterline. Mr. Roth stated that Tracey Roth was not present for this meeting. [T., pp. 31-32, 47].

10

33.     Mr. Roth also confirmed that the parties agreed that the waterline "could run 24 hours per day", and that the supply of water was measured at 4 to 5 gallons per minute. There was never any agreement that Mr. Marshall could terminate the water supply. [T., pp. 32-33].

34.     Mr. Roth indicated that they kept running into problems in that his line would be taken out of the water.   He spoke to Richard Marshall, who told him it wasn't his responsibility to maintain water for Mr. Roth.   Mr. Roth said that he extended the waterline with Anthony DiFolco's permission up to his pond and installed a shutoff on the other end of it. [T., p. 33].

35.     After Mr. Roth extended the waterline up to the DiFolco pond, Mr. Marshall cut off the water supply at a pool of water below that is on the Marshall property.   It was at that time that Mr. Roth contacted Attorney Wicks. [T., pp. 33-34].

36.     Mr. Roth claimed that the well on his property does not supply all the water he needs.   For example, in the summer, they need additional water from the stream for outside and inside activities, e.g., watering his lawn and shrubs, washing his vehicle, power washing his house, doing dishes and laundry, taking showers, etc. [T., p. 36].

11

37.   Mr. Roth confirmed that Mr. Marshall unilaterally cut off the waterline without his prior knowledge or permission in or about October, 2016.   [Plaintiffs' Exhibit 10 and T., pp. 33-34, 37-38].

38.   Mr. Roth could not specifically refute that the tank on his property is fed by a pipe that traveled through the Marshall property through a manmade ditch dug from a pool below the waterfall that comes from the DiFolco property, onto the Marshall property, all the way down to the tank. [T., pp. 42-43].

39.   Mr. Roth acknowledged that in order for the water to get from the pool on the Marshall property over to the tank, it was necessary to have a pipe installed for the water to flow under the road.   Mr. Roth was not involved in the installation of this pipe, nor was he aware of when the pipe was put in. [T., p. 46].

40.   Mr. Roth admitted that without the pipe being put under the road, the water would not have been able to get from the pool on the Marshall property over to his (Roth) property. [T., p. 47].

41.   The deed into the Plaintiffs [Defendants' Exhibit 2] dated October 27, 1994 does not reference anything concerning water rights. [T., pp. 51-52].

42.   Mr. Roth acknowledged that relative to the water rights referenced in the Kurtz to DeMatteis deed from 1927 [Plaintiffs' Exhibit 6], that he has never bathed, nor swam in the stream, nor raised any fish. [T., pp. 55-57].

43. Mr. Roth confirmed that the water that went into the tank was used for personal consumption. [T., p. 57].

44. Mr. Roth admitted that there have been a few occasions when he has gone on to the Marshall property to clean the leaves off the screen, but denies that he did so without Mr. Marshall's knowledge or permission. [T., pp. 60-62].

45. Mr. Roth admitted that there is nothing in writing from Mr. Marshall conveying any water rights from his property onto Plaintiffs; e.g., there was no easement recorded at the courthouse. [T., p. 61].

46. **Richard B. Marshall** acquired his property in Tyrone Township in 1967. [Defendant's Exhibit 4 and T., p. 76].

47. The deed dated November 24, 1967 and recorded at Blair County Deed Book Volume 867, Page 395 wherein the Defendant, Richard B. Marshall and his then wife became owners of the property in Tyrone Township, consisting of 57.08 acres, contained the following language:

> ALSO, THE PERPETUAL right to grantees, their heirs and assigns to use without liability (as defined in deed from Gail Scott Kurt and Charles M. Kurtz, her husband, to Mary D. DeMatteis, dated November 16, 1927, and recorded in Blair County Deed Book 366, Page 265), the water flowing through lands conveyed by said deed as well as the lands herein conveyed for the purpose of swimming, bathing and propagation of fish.

[Defendants' Exhibit 4].

13

48. Mr. Marshall testified that the water comes off the pond on Mr. DiFalco's property down their falls and into a pond. The stream continues and flows away from the Plaintiffs' property and ultimately ends up in a pond on the Albright property. [T., pp. 79-80].

49. Mr. Marshall acknowledged there was a ditch from the falls, under the road to the other side, that ultimately went to Carl and Tracey Roth's property, feeding into the holding tank. [T., pp. 88 and 91].

50. Mr. Marshall has no idea as to when the holding tank was installed, nor by whom. [T., p. 92].

51. Mr. Marshall was aware that after Carl and Tracey Roth built their home, they continued to get water from the holding tank. [T., pp. 94 and 98-99].

52. Mr. Marshall agreed that Carl and Tracey Roth had problems with the lack of water flow from the ditch into the holding tank, which led to the installation of a pipe. [T., pp. 99-100].

53. Mr. Marshall indicated that Carl and Tracey Roth "were very good friends" and that he agreed to put the pipe in "as a friend." [T., p. 100].

14

54. Mr. Marshall recalled an agreement being made in 1997, however, it is his recollection that the agreement was for the benefit of Tracey Roth. Mr. Marshall claims that he knew Mark Roth had his own well and that he felt no obligation to Mr. Roth. He also denied that Mr. Roth was part of this conversation. It was also Mr. Marshall's recollection that he paid the entire amount for the pipe, although he acknowledged that he may have only paid one-half of the cost. [T., pp. 100-102; 112-113].

55. Relative to the discrepancies as to who was present and what the exact nature of the discussion and agreement was during this 1997 meeting, we find Harry Albright's testimony to be more credible. In fact, Mr. Marshall acknowledged that Mr. Albright is a friend and a good neighbor. [T., p. 111].

56. Mr. Marshall confirmed that Harry Albright and Cletus Steinbeiser installed the pipe and agreed that the pipe also benefited Mr. Albright. [T., p. 102].

57. A dispute arose with Mark Roth, and Mr. Marshall did not want Mr. Roth to continue entering upon his property. Therefore, he had Attorney Traci Naugle send a letter to Mr. Roth dated October 26, 2016 [Defendants' Exhibit 9]. Mr. Marshall acknowledged that after the letter was sent, he shut off the water by cutting the pipe. He

15

then engaged the services of Attorney Stants, who sent a letter to Plaintiffs' counsel, Attorney Wicks, dated February 13, 2017. [Defendants' Exhibit 10 and T., pp. 106-110].

58. Mr. Marshall agreed that there was a water flow of 5 gallons per minute from the installed pipe, as measured by Mr. Albright and Mr. Steinbeiser. [T., p. 113].

59. Mr. Marshall acknowledged that periodically, individuals would have to clear leaves from the ditch to get the water flowing again, requiring such individuals to enter upon his property. [T., pp. 117-118].

60. Mr. Marshall stated that the "no trespassing" signs situated on his property are mostly for hunters, with whom he has had problems in the past. He has never sought to have anyone prosecuted who entered upon his property for the purpose of clearing leaves out. [T., pp. 117-118].

61. The Defendant, **Bryce Marshall,** is the son of Richard G. Marshall. [T., p. 120].

62. Bryce Marshall owns real property in Tyrone Township which is adjacent to the Plaintiffs' property. The deed into Bryce Marshall is dated February 1, 2006. [Defendants' Exhibit 11]. This property formerly belonged to Tracey Roth and had a house situate on it. [T., pp. 120-121].

16

63.     When Richard G. Marshall sold the property to Carl and Tracey Roth, he retained a right of first refusal. [T., p. 121].

64.     Bryce Marshall was aware that his father allowed a pipe to be installed to ensure that Tracey Roth received water at her home. The conditions of the ditch drying up and the leaves clogging the drain had gone on for years. Once the pipe was installed, it improved the flow of water. [T., p. 123].

65.     When Bryce Marshall purchased the property, his water source was originally from the holding tank. They had a well drilled, at which time the well driller shut off the line coming from the holding tank to the house. [T., pp. 123-124].

66.     Bryce Marshall had no knowledge that the Plaintiffs had a line running from the holding tank to their home. On one occasion, when he inquired of Mark Roth as to what purpose he used the water, Mr. Roth explained that he had an insufficient supply of water from his well and that he would occasionally attach a garden hose to the tank. [T., pp. 124-125].

67.     Bryce Marshall testified that on one weekend, they discovered a new, long, spiraling black line running from the existing water pool up through the waterfalls and into Mr. DiFalco's pond. This line was put in by Mark Roth without permission from the Marshall family. The Marshall family contacted Attorney Tracey Naugle and upon

17

receiving a response from her, Richard G. Marshall disconnected the line. [T., pp. 125-126].

68.    Bryce Marshall indicated that Mark Roth and his father had previously argued about the water issues. As Bryce Marshall explained: "That was always an ongoing thing". [T., p. 127].

69.    Bryce Marshall personally spoke to Mark Roth in 2010 or 2011. He confirmed that thereafter, Mr. Roth still came upon the Marshall property to talk to his father. Bryce Marshall explained that there were times when they would give Mr. Roth permission to clean out the ditch, and other times they would clean it out themselves. Bryce Marshall also acknowledged that Mr. Roth would seek permission to enter upon their land, but that such would result in an argument between Mr. Roth and Bryce's father. [T., p. 128].

70.    Bryce Marshall confirmed that a deed was conveyed in 2006 from his father into his father and he and his brother, so that all three are the joint owners of the real property where the water supply was cut off. [T., p. 129].

18

## DISCUSSION:

One of the first contested issues we must decide is who was present for the 1997 conversation when an agreement was made to install a pipeline to direct water from the main stream (from a pond on the Marshall property) to the Roth property? In this regard, we rely upon and accept as credible the testimony of Harry I. Albright.

First of all, Mr. Albright is not a party to this lawsuit, and testified that he is a neighbor and personally knows all the parties. Therefore, he is truly a disinterested and unbiased witness. Mr. Albright's recollection as to the details of the meeting were more positive and convincing, as compared to Mr. Marshall's recollection. Further, we also find that Mr. Richard Marshall's testimony was affected by certain prior incidents involving Mark Roth. Mr. Marshall testified that the road (Kurtz Road) had potholes and was in need of repair. He indicated that his son used a front-end loader to fill in all the potholes and that he (Richard Marshall) paid for all the repairs. Mr. Marshall pointed out that quite a few neighbors (which included Mark Roth) did not contribute to the road's repairs or even thank them. It was evident to us in listening to and observing Mr. Marshall during his testimony that this was and remains upsetting to him. Finally, Mr. Marshall also was bothered by Mark Roth entering upon his land to clear leaves from the ditch without seeking his permission. Such is supported by the fact that he sought legal

19

representation (Attorney Naugle) and had a letter sent to Mark Roth, after which he cut the pipe and shut off the water supply. The pipe was installed in 1997 and utilized by the Plaintiffs for nineteen (19) years until unilaterally cut off by Mr. Marshall in or about October 2016. Furthermore, during that period of time, there does not appear to have been any major issues with Mr. Roth (and others) entering upon the Marshall property to clear leaves from the ditch.

The above findings do not end our inquiry, however. First of all, there is no dispute that the agreement made in 1997 was oral in nature. It was never put into writing. As Mr. Roth acknowledged, there is no easement agreement from Mr. Marshall recorded at the courthouse.

In addition, although the Plaintiffs benefited from installation of the pipe, they did not contribute to the installation of same in any manner. They did not perform the physical labor (which was done by Mr. Albright and Mr. Steinbeiser), nor make any financial contributions to its installation and subsequent burial underground (Mr. Albright and Mr. Marshall each paid one-half). Thus, there was no consideration from the Plaintiffs relative to the oral agreement made in 1997.

20

It is evident from the testimony that the natural stream on the Defendants' property does not flow toward and upon the Plaintiffs' property. The water that the Plaintiffs have obtained over the years has been through a manmade ditch dug at some point prior to the Defendants acquiring their property.

We next turn to the deeds in question. There is no provision in the Plaintiffs' deed [Plaintiffs' Exhibit 2 and Defendants' Exhibit 2] which grants to them any right to obtain water via a diversion of the naturally occurring stream which passes through the Defendants' property.

It is also important to note that even if we agreed with the Plaintiffs that the Kurtz to DeMatteis deed granted them water rights, such would be limited to the clear and exact language of the deed, i.e., limited to swimming, bathing and propagation (breeding) of fish. There is nothing in the Kurtz to DeMatteis deed that states, or could even be construed to state, that the Plaintiffs have a right to the diversion of water from the naturally flowing stream to their property.

Based upon the above, we make the following:

## CONCLUSIONS OF LAW:

1. The same principles that apply to the interpretation of a contract apply to the interpretation of a deed. See **New Charter Coal Co. v. McKee**, 191 A.2d 830, 834 (Pa. 1963). The nature and quantity of the interest conveyed by a deed "must be

21

ascertained from the instrument itself." *In re Property of W. R. Covert*, 186 A.2d 20, 23 (Pa. 1962) (quoting *Yuscavage v. Hamlin*, 137 A.2d 242, 244 (Pa. 1958)). Thus, "the language of the deed shall be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed." *Highland v. Commonwealth*, 161 A.2d 390, 402 (Pa. 1960).

2. When it comes to water rights, the construction of those rights is to be "most liberal" and "most advantageous" to the grantee without being onerous to the grantor. *Eastern Pennsylvania Power Company v. Lehigh Coal and Navigation Co.*, 246 Pa. 72, 74 (Pa. 1914).

3. In interpreting the "Excepting and reserving" language of the Kurtz to DeMatteis deed dated November 16, 1927 [Plaintiffs' Exhibit 6], it was the Grantors who reserved the perpetual right to use for the *purpose of swimming, bathing, and propagation of fish* (emphasis added) the water flowing through other land of the Grantors herein, as well as through land herein surveyed, for themselves, their heirs and assigns.

4. In interpreting the relevant language of the Kurtz to Marshall deed dated November 11, 1967 [Defendants' Exhibit 4], the perpetual right to use the water flowing through lands conveyed by said deed as well as the lands herein conveyed *for the*

22

*purpose of swimming, bathing and propagation of fish* (emphasis added) was conveyed to the Grantees (Marshall) and their heirs and assigns.

5.    In order to be entitled to reasonable use of water flowing from the property of another, the party claiming such a right has the burden of proving the water in question is flowing or tributary. ***Village of Four Seasons Association, Inc. v. Elk Mountain Ski Resort, Inc.,*** 103 A.3d 814, 820-22 (Pa. Super. 2014).

6.    Because no document of record in Plaintiffs' chain of title grants them any right to divert water from Defendants' property to their own for personal uses, their claim is barred by the affirmative defense of Statute of Frauds, 33 P.S. §1, which has been the law of this Commonwealth since March 21, 1772.

7.    Plaintiffs may not claim any prescriptive rights in the water as there was no evidence presented at trial which established that there use of the water was adverse, open, notorious, continuous and uninterrupted use for a period of twenty-one (21) years. ***Walley v. Iraca***, 520 A.2d 886, 889 (Pa. Super. 1987).

8.    The party asserting a prescriptive easement must demonstrate "clear and positive" proof. ***Wally,*** 520 A.2d at 889.

9.    Evidence presented at trial indicated that Plaintiffs' use of the water from the holding tank was a matter of personal convenience and did not establish that they required such water as a strict necessity.

23

10. An easement by necessity is always of strict necessity; an easement by necessity never exists as a mere matter of convenience. *Youst v. Keck's Food Service, Inc.,* 94 A.3d 1057, 1075 (Pa. Super. 2000).

11. The installation of the pipe by Defendant, Richard B. Marshall, established that the use of the water which flowed from the stream on Defendants' property to the holding tank on Plaintiffs' property was entirely permissive and could be terminated at any time, thus creating nothing more than a license. *Thompson v. McElarney*, 82 Pa. 174, 177-78 (1876).]

12. In general, a license is a mere personal or revocable privilege to perform an act or series of acts on the land of another, which conveys no interest or estate; a licensee is simply given permission by the occupant of the land to do something that otherwise would be a trespass. *Morning Call, Inc., v. Bell Atlantic-Pennsylvania, Inc.*, 761 A.2d 139, 144 (Pa. Super. 2000).

13. A license is distinguishable from an easement because it is usually created orally, is revocable at the will of the licensee, and is automatically revoked by the sale of the burdened property. *Id.* at 144.

14. A license is generally considered a "mere personal privilege to perform an act or series of acts on the land of another." *Kovach v. General Telephone Co. of Pennsylvania*, 489 A.2d 883, 885 (Pa. Super. 1985).

15. Licenses are freely revocable and only become irrevocable when a licensee relies to its detriment upon it. *Zivari v. Willis*, 611 A.2d 293, 296 (Pa. Super. 1992).

16. An injunction is a court order that can prohibit or command virtually any type of action. It is an extraordinary remedy that should be issued with caution and "only where the rights and equity of the plaintiff are clear and free from doubt, and where the harm to be remedied is great and irreparable." 15 Standard Pennsylvania Practice 2d §83:2 (2005). *Big Bass Lake Community Assn. v. Warren*, 950 A.2d 1137, 1144 (Pa. Cmwlth. 2008).

17. The required elements of injunctive relief are: a clear right to relief; an urgent necessity to avoid an injury that cannot be compensated in damages; and a finding that greater injury will result from refusing, rather than granting, the relief requested. *Id.*

18. Plaintiffs have failed to establish a clear right to relief, an urgent necessity to avoid an injury that cannot be compensated in damages, or that a greater injury will result from refusing the relief they have requested.

25

19. Based on the factors stated herein, Plaintiffs have not met their burden of establishing that they are entitled to claim any rights in the water flowing through Defendants' property and, as a result, their request for injunctive relief must be denied.

In light of the foregoing, we now enter the following:

O

R

D

E

R

# IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

MARK J. ROTH and MICHELLE A. ROTH,
husband and wife,

           PLAINTIFFS     :    2017 GN 3490

v.

RICHARD B. MARSHALL, BRYCE C.
MARSHALL and RICHARD B. MARSHALL, II,
           DEFENDANTS

HON. TIMOTHY M. SULLIVAN          PRESIDING JUDGE

STEPHEN D. WICKS, ESQUIRE        COUNSEL FOR PLAINTIFFS
DANIEL L. STANTS, ESQUIRE         COUNSEL FOR DEFENDANTS

## AMENDED OPINION AND ORDER

### PROCEDURAL HISTORY:

On December 15, 2017, the Plaintiffs, **Mark J. Roth** and **Michelle A. Roth**, husband and wife, (hereinafter "Roth") filed a Civil Complaint seeking injunctive relief against the Defendants, **Richard B. Marshall, Bryce C. Marshall** and **Richard B. Marshall, II**, (hereinafter "Marshall"). The parties are owners of real property situated in Tyrone Township, Blair County, Pennsylvania. Roth acquired their property by deed dated October 27, 1994, after which they built a residence, drilled a well and moved in during April of 1995. Roth claims that they continued to utilize the stream in question as a joint source of water with their well and that the Defendants, acting individually or in

1

concert, terminated the flow of water through a pipe to the Roth property on or about November 5 or 6, 2016. Roth seeks to permanently enjoin the Defendants from interfering in any manner with the water rights the Plaintiffs' claim they have secured.

The Defendants filed an Answer, New Matter and Counterclaim to the Plaintiffs' Complaint on January 11, 2018. In summary, Marshall denies that the Plaintiffs have any right to obtain water from the Defendants' property for their personal use, and seek their own order enjoining Mr. Roth from entering upon their land for any purpose, unless he has first obtained written permission.

On February 9, 2018, the Plaintiffs filed a Response to Answer, New Matter and Counterclaim. The matter proceeded to a trial by court on August 22, 2018, at which time the Plaintiffs presented the testimony of **Harry I. Albright** and **Mark J. Roth.** The Defendants presented the testimony of **Richard B. Marshall** and his son, **Bryce C. Marshall.** Several exhibits were admitted into the record on behalf of both parties. Counsel submitted proposed Findings of Fact and Conclusions of Law. We entered an Opinion and Order dated October 29, 2018, denying the Plaintiffs' Request for Injunctive Relief.

On November 8, 2019, Plaintiffs filed Post Trial Motions. On November 15, 2018, the Defendants filed a Response to Plaintiffs' Post Trial Motions. Oral argument was held on January 23, 2019. Since oral argument, we have conducted a "fresh" review of the entire transcript from the August 22, 2018 trial, as well as all exhibits that were admitted into the record. As a result, we make the following:

**_AMENDED FINDINGS OF FACT:_**

1. The Plaintiffs are Mark J. Roth and Michelle A. Roth, husband and wife, who reside at 254 Kurtz Drive, Altoona, Pennsylvania. [Complaint and Answer, ¶1, Admitted and Trial Transcript, p. 27].

2. Defendant, Richard B. Marshall, resides at 122 N. Bedford Street, #1, Carlisle, Pennsylvania. [Complaint and Answer, ¶2, Admitted and T., p. 76].

3. Defendant, Bryce C. Marshall, resides at 266 Labor Camp Road, Gardners, Pennsylvania. [Complaint and Answer, ¶3, Admitted and T., p. 120].

4. Defendant, Richard B. Marshall II, resides at 84 Victory Church Road, Gardners, Pennsylvania. [Compl and Answer ¶4, Admitted].

3

5.     The Plaintiffs are the owners of real property, which includes their residence, situated in Tyrone Township, Blair County, Pennsylvania.  Said parcels of ground are fully described in deed dated October 27, 1994 from Tracey D. Roth, widow, and Mark J. Roth and Michelle A. Roth, husband and wife into Mark J. Roth and Michelle A. Roth, husband and wife, as recorded in Blair County Deed Book 1246, Page 809.  [Plaintiffs' and Defendants' Exhibit 2].

6.     As set forth in the deed dated October 27, 1994 into Mark J. Roth and Michelle A. Roth, husband and wife (DBV 1246 – 809), the subject parcels are described as follows:

> ALL THOSE CERTAIN pieces or parcels of land situate in Tyrone Township, Blair County, Pennsylvania, being bounded and described as follows:
>
> BEGINNING at an existing iron pin being a common point of other lands now or formerly of Carl D. Roth, et al and lands of Mathilda H. Demuth; thence north 26 degrees 00 minutes 00 seconds east a distance of 305.50 feet to an existing iron pin; thence south 57 degrees 45 minutes 00 seconds east a distance of 164.36 feet to an iron pin; thence south 26 degrees 00 minutes 00 seconds west a distance of 515.28 feet to appoint on said road; thence north 56 degrees 41 minutes 38 seconds west a distance of 20.07 feet a point; thence north 26 degrees 00 minutes 00 seconds east a distance of 148.83 feet to a point; thence north 36 degrees 00 minutes 00 seconds west a distance of 162.50 feet to the point of beginning.  CONTAINING 1.3414 acres based upon survey of Pellegrini Engineers dated April 11, 1990.

4

ALSO BEGINNING at an iron pin being a point on the northern side of a 33 foot access road from Legislative Route 07053 known as Sinking Valley Road and being a point at the bend of an existing stone wall; thence south 75 degrees 21 minutes 51 seconds west a distance of 155.38 feet to an iron pin; thence north 56 degrees 41 minutes 38 seconds west a distance of 131.37 feet to a point; thence north 26 degrees 00 minutes 00 seconds east a distance of 515.28 feet to an iron pin; thence south 57 degrees 45 minutes 00 seconds east a distance of 213.25 feet to an iron pin; thence south 20 degrees 55 minutes 11 seconds west a distance of 409.18 feet to the point of beginning. CONTAINING 2.6214 acres based upon survey of Pellegrini Engineers dated April 11, 1990.

BEING A PORTION OF THE SAME PREMISES title to which became vested in Carl D. Roth and Tracey D. Roth, husband and wife, and Mark J. Roth, by deed of Carl D. Roth, et al, dated April 27, 1990 and recorded in Blair County Deed Book Volume 1183, Page 536. The said Carl D. Roth died the 22nd day of November, 1991, thereby vesting their interest solely in Tracey D. Roth, as surviving tenant by the entireties. Mark J. Roth has since intermarried with Michelle A. Roth, who joins in the within conveyance.

7. The first parcel described in Deed Book 1246, Page 809, contains 1.341 acres, based upon a survey of Pellegrini Engineers dated April 11, 1990. This ground is described as Parcel #3 in said survey. The second deed description is for a parcel of land consisting of 2.6214 acres, based upon the same Pellegrini survey and identified as Parcel #4. [Plaintiffs' Exhibit 5 and Transcript, p. 28].

5

8.     The Defendants are owners of real property located on Kurtz Drive, Altoona, PA as more specifically set forth in a deed dated February 14, 2006, Instrument No. 200603242 (attached as Exhibit "A" to Plaintiffs' Complaint), said parcel consisting of 57.078 acres, which is contiguous to and upstream from the aforedescribed lands of Plaintiffs. [Complaint and Answer, ¶6, Admitted].

9.     The respective chain of title for the Plaintiffs was set forth in Exhibit "C" attached to Plaintiffs' Complaint, while the Defendants' predecessors in title are set forth in Exhibit "D" attached to Plaintiffs' Complaint.     Those chains of title are incorporated herein and are not in dispute.

10.     The land identified as Parcel #4 in the Pellegrini survey was originally acquired by Plaintiffs' predecessors in title by deed of Gail Scott Kurtz and Charles K. Kurtz, her husband, to Mary D. DeMatteis on November 16, 1927. [Plaintiffs' Exhibit 6].

11.     In the deed dated November 16, 1927 from Gail Scott Kurtz and Charles K. Kurtz, her husband, to Mary P. DeMatteis (DBV 366-265), the property description was as follows:

6

ALL that certain lot or piece of ground situate, lying and being in the Township of Tyrone, County of Blair and State of Pennsylvania, bounded and described as follows: - - -

BEGINNING on a private road, corner of the Frederick farm and farm of George F. Kidd; thence in a Westerly direction, along line of Frederick farm, ten hundred and twenty-seven (1027) feet to a Maple tree; thence in a Northerly direction, along line fence, seven hundred and sixty-two (762) feet to a post; thence in an Easterly direction, three hundred and thirty-eight (338) feet to a post on line of private road aforesaid; thence in a Southeasterly direction, along line of said private road, five hundred and fifty-six (556) feet to an apple tree; and thence in a Southerly direction, along said road, three hundred and ten (310) feet to the place of beginning. - - -

ALSO, all that certain lot or piece of ground situate, lying and being in the Township of Tyrone, County of Blair and State of Pennsylvania, bounded and described as follows: - - -

BEGINNING at a stone; thence North twenty-one and one-fourth (21 ¼) degrees East twenty-six (26) perches to a stone; thence North sixty-six (66) degrees West twelve (12) perches to a stone; thence South twenty-two (22) degrees East twenty-nine (29) and one-half (29 ½) perches to a post; thence South fifty-one (51) degrees East four (4) perches to a post; thence North sixty-six (66) degrees East six and one-half (6 ½) perches to a stone, the place of beginning, containing one acre and one hundred thirty-five (135) perches. - - -

BEING the same property the title to which became vested in Gail Scott Kurtz, one of the grantors herein, by deed of A.C. Myton, widower, dated the 13th day of September, 1927, and recorded in the office for the recording of deeds, etc., in and for Blair County in Deed Book, Vol. 363, Page 699. - - -

Excepting and reserving, however, from the force and operation of this deed, the perpetual right to the grantors herein, their heirs and assigns, to use for the purposes of swimming, bathing and propagation of fish the water flowing through other lands of the grantors herein as well as through land herein conveyed, and by acceptance of this deed the grantee, for herself, their heirs and assigns, release the said grantors, their heirs and assigns, from any and all liability for any contamination resulting, directly or indirectly, from such usage of the stream.

7

Grantors, their heirs and assigns, shall not divert the stream of water now flowing through lands herein conveyed. - - -

[Plaintiffs' Exhibit 6].

12. The "Excepting and reserving" paragraph set forth in the Kurtz to DeMatteis deed above is at issue herein.

13. In the Plaintiffs' chain of title, the "Excepting and reserving" language set forth in the Kurtz to DeMatteis deed dated November 16, 1927 was also set forth in the following conveyances:

(a) Mary D. DeMatteis and Guy DeMatteis, her husband to Walter B. Trout and Mary Susan Trout, his wife, deed dated April 10, 1931 and recorded in Blair County Deed Book Volume 402, Page 8.

(b) Walter B. Trout and Mary Susan Trout, his wife, to Josephine C. DeMatteis, deed dated January 28, 1933 and recorded in Blair County Deed Book Volume 408, Page 698.

(c) Josephine DeMatteis to Frank A. Riccio, deed dated July 6, 1944 and recorded in Blair County Deed Book Volume 489, Page 435.

(d) Frank A. Riccio and Lucy Riccio, his wife to Carl Roth, deed dated September 13, 1948 and recorded in Blair County Deed Book Volume 592, Page 464.

(e) Ethel A. Roth, widow, et al. to Carl D. Roth and Tracey D. Roth, his wife, and Mark J. Roth, deed dated March 14, 1983 and recorded in Blair County Deed Bool Volume 1086, Page 150.

14. After the above conveyances, there was no further reference to the "Excepting and reserving" language in any subsequent deeds within the Plaintiffs' chain of title.

8

15. The Plaintiffs' lands were acquired by Carl Roth, the father of the Plaintiff, Mark J. Roth, on September 13, 1948 by deed of Frank A. Ricco and Lucy Ricco, husband and wife, dated September 13, 1948 and recorded in Blair County Deed Book Volume 592, page 464. [Plaintiffs' Exhibit 3].

16. The property description set forth in the deed dated September 13, 1948 from Frank A. Ricco and Lucy Ricco into Carl Roth (DBV 592-464) is the same property description set forth in the deed dated November 16, 1927 between Gail Scott Kurtz and Charles M. Kurtz into Mary D. DeMatteis. (DBV 366-265). [Plaintiffs' Exhibit 3].

17. The above deed description remained the same in the subsequent conveyance into Carl D. Roth and Tracey D. Roth, his wife, and Mark J. Roth, deed dated March 14, 1983. (DBV 1086-150) [Plaintiff's Exhibit 3].

18. After the above conveyance, a survey was performed by Pellegrini Engineers dated April 11, 1990. Per the Pellegrini survey, the land was divided into three parcels.

The first parcel consists of 1.3414 acres (Parcel 3); the second parcel consists of 2.6214 acres (Parcel 4); and the third parcel consists of 12.7293 acres (Parcel 5). [Plaintiffs' Exhibit 5].

19. The description of the three parcels of land from the Pellegrini survey were utilized in the deed dated April 27, 1990 from Carl D. Roth and Tracey D. Roth, husband and wife and Mark J. Roth into themselves (DBV 1183-536) and then in the deed dated October 27, 1994 from Tracey D. Roth, widow and Mark J. Roth and Michelle A. Roth, husband and wife, into the Plaintiffs herein. (DBV 1246-809). [Plaintiffs' Exhibit 3 and Defendants' Exhibit 2].

20. After acquiring the parcels of land in 1994, the Plaintiffs built a new home, drilled a well and moved in during April of 1995. The Plaintiffs continued to utilize the stream in question as a supplemental source of water, with the well they drilled being their primary source of water. [T., pp. 30, 40-41, 50-51 and 125].

21. During their case-in-chief, the Plaintiffs presented **Harry I. Albright**, who resides at 4540 Kettle Road, Altoona, Pennsylvania. Mr. Albright has lived on this property, which is a farm, since 1947. This property has been in his family since the 1800's. Mr. Albright is 76 years of age, is a neighbor and personally knows the parties. [T., pp. 7-8].

10

22.    Mr. Albright confirmed that he is familiar with the stream in question, which he described as "a main stream". He indicated that the stream begins up in the flat of the mountain on state game land. It runs on the edge of the state game land and goes onto his land, then comes down through the Frankel/Reese property, then onto Anthony Difolco's property, then the Marshall property, then the Priddy property and back onto the Albright property. He indicated that he built a pond there and ultimately, the stream runs into a sink hole at the edge of his field and goes underground. [Plaintiffs' Exhibit 5, T., p. 10].

23.    At the Difolco property, there is another branch to the stream. Such branch of the stream comes off of the Marshall property and runs into the Roth property (Parcel #4) [T., pp. 11-12].

24.    Mr. Albright recalled that Carl and Tracey Roth lived in the original house on the Roth property. (Parcel #4). He indicated that as far as he knew, the stream was the only source of water to Carl and Tracey Roth's home at that time. [T., p. 12].

25.    Relative to the other branch of the stream that comes down to his property, Mr. Albright testified that it comes down at the "upper side" of Parcel #5 and runs "along the edge" of Parcel #5, but it does not go through it. Mr. Albright said this branch of the

11

stream angles toward his property and then comes through his property approximately 4 feet on his side of the property line and into his pond. [T., pp. 12-13].

26.     Mr. Albright testified that for 50 years, the stream was and still is his main source of water.   Often times during the summer, when the weather was dry, there was very little water.   He confirmed that Carl and Tracey Roth would also run out of water at times and would have to divert water from the stream to their property. [T., pp. 13-14].

27.     Mr. Albright testified that it was his understanding that Richard B. Marshall planned to build a pond.  There was a meeting in 1997 at Mark Roth's house involving Mark Roth, Richard B. Marshall and Mr. Albright, where they discussed putting in a pipeline to divert the water from the main stream to ensure that Mr. Albright would get more water, Mr. Marshall would get more water and Mr. Roth would be assured of water during dry weather.  Mr. Marshall agreed to pay for one-half (1/2) of the pipe and Mr. Albright paid for the other half.  Mr. Albright confirmed that it was the parties' agreement that the pipe "could run full bore 24-7." [T., pp. 14-15].

28. In reliance upon said agreement, Mr. Albright and Cletus Steinbeiser, who had a backhoe, actually laid the waterline in the spring or summer of 1997. Most of the line went through the Marshall property. Mr. Albright and Mr. Steinbeiser buried the line underground in the winter of 1997 so that it would not freeze. [T., pp. 15-16].

29. Mr. Albright also said that they measured the amount of water that ran through the pipe and that it averaged 5 gallons per minute. [T., p. 15].

30. Mr. Albright testified that before this present dispute, that: "And from 1997 up until five or six years ago, everything - - - everybody was satisfied. Everything was going okay. And now we're where we're at." Mr. Albright later confirmed that the agreement made in 1997 was fine, adding: "Everybody for a number of years seemed to be well satisfied with it." [T., pp. 15-16].

31. Mr. Albright stated that the Marshall to Roth leg of the stream was "man-made" and that the main stream did not run naturally to the Roth parcel. [T., pp. 16-18].

32. Mr. Albright confirmed that the stream splits at the Marshall/Difolco junction. He indicated "the split was man-made because it would have never run to Roth's naturally the way the creek came down over Mr. Difolco's falls . . . it wouldn't have been a natural main stream the way it was there." [T., p. 18].

13

33.    Mr. Albright confirmed that the main stream that passes through the Marshall property comes over a water fall from the Difolco property, and that stream makes a turn towards his property and away from the Roth property. [T., p. 19].

34.    Mr. Albright testified that the water that flowed to the holding tank on the Roth property came from the man- made stream that originated at a pool just under the water fall on the Marshall property.    He said there was a holding tank that supplied water to the Roth property and that the holding tank is not currently connected to the Plaintiffs' home, to his knowledge. [Plaintiffs' Exhibit 8; Defendants' Exhibit 1 and T., pp. 19-20].

35.    Mr. Albright confirmed that the parties' agreement in 1997 was oral and never put into writing. [T., pp. 20-21, 23].

36.    Mr. Albright also confirmed that the purpose in installing the pipe was to ensure that Tracey Roth had an ample supply of water to her property year-round, however, he also confirmed that an additional purpose was to benefit Mark & Michelle Roth, who had moved into their new house.  [T., pp. 24-25].

37.    After the pipe was put in, Mr. Albright had no further involvement in the matter between the parties. [T., p. 24].

14

38.     The Plaintiff, **Mark J. Roth**, confirmed that he has lived on his property his entire life. He was born October 27, 1967. After he and his wife built their new home and moved in during April 1995, the old family home was torn down in 1996 (which was located on Parcel #4 on the survey by Pellegrini Engineers, Plaintiffs' Exhibit 5). [T., pp. 27-29].

39.     Mr. Roth confirmed that when he built his new home, they had a well drilled to satisfy the bank. The well serves as their primary source of water. He also drew water from the holding tank by connecting a garden hose with a shut off valve so as to not waste water. He would use this water supply to fill his well when needed. [T., pp. 30-31].

40.     The stream was the only water source for the original home where Carl and Tracey Roth lived. [T., pp. 30-31].

41.     Mr. Roth indicated that the stream came down off the mountain into the holding tank and that there were three lines installed, one for the Marshall home, one for his home and one for his sister, who lived on Parcel #5. [T., pp. 30-31].

15

42.    Mr. Roth stated that the 1997 meeting occurred on the deck of his new home. He indicated that he, Richard B. Marshall and Harry Albright were all present and that they came up with the idea of putting in a waterline, with Mr. Marshall paying for one-half and Mr. Albright paying for one-half.   The plan was to have all the water come off the Difolco's property, run into Marshall's pond, then back into a stream, and then over to Albright's property.   Mr.   Roth did not contribute financially to installation of the waterline.    Mr. Roth stated that Tracey Roth was not present for this meeting. [T., pp. 31-32, 47].

43.    Mr. Roth also confirmed that the parties agreed that the waterline "could run 24 hours per day", and that the supply of water was measured at 4 to 5 gallons per minute. There was never any agreement that Mr. Marshall could terminate the water supply. [T., pp. 32-33].

44.    Mr. Roth indicated that they kept running into problems in that his line would be taken out of the water.   He spoke to Richard Marshall, who told him it wasn't his responsibility to maintain water for Mr. Roth.   Mr. Roth said that he extended the waterline with Anthony Difolco's permission up to his pond and installed a shutoff on the other end of it. [T., p. 33].

16

45.    After Mr. Roth extended the waterline up to the Difolco pond, Mr. Marshall cut off the water supply at a pool of water below that is on the Marshall property. It was at that time that Mr. Roth contacted Attorney Wicks. [T., pp. 33-34].

46.    Plaintiffs' Exhibit 8 is a photograph depicting the holding tank where the stream emptied. There was a pipe that would cross over into a smaller tank and that is where the three water lines were tapped into the tank. [T., p. 34, Plaintiffs' Exhibit 8].

47.    Mr. Roth claimed that the well on his property does not supply all the water he needs. For example, in the summer, they need additional water from the stream for outside and inside activities, e.g., watering his lawn and shrubs, washing his vehicle, power washing his house, doing dishes and laundry, taking showers, etc. [T., p. 36].

48.    Mr. Roth confirmed that Mr. Marshall unilaterally cut off the waterline without his prior knowledge or permission in or about October, 2016. [Plaintiffs' Exhibit 10 and T., pp. 33-34, 37-38].

49.    Plaintiffs' Exhibit 11 is a photograph looking from the Difolco property showing a wooden bridge that goes across the top of his (Difolco) dam. One can look down into the pool where the stream splits. The pool is on the Marshall property. This is the same split in the stream as testified to by Mr. Albright. [T., pp. 38-39, Plaintiffs' Exhibit 11].

17

50. Mr. Roth could not specifically refute that the tank on his property is fed by a pipe that traveled through the Marshall property through a man-made ditch dug from a pool below the waterfall that comes from the Difolco property, onto the Marshall property, all the way down to the tank. [T., pp. 42-43].

51. Mr. Roth acknowledged that the origins of the stream bed are unknown to him. [T., p. 43].

52. Mr. Roth acknowledged that in order for the water to get from the pool on the Marshall property over to the tank, it was necessary to have a pipe installed for the water to flow under the road. Mr. Roth was not involved in the installation of this pipe, nor was he aware of when the pipe was put in. [T., p. 46].

53. Mr. Roth admitted that without the pipe being put under the road, the water would not have been able to get from the pool on the Marshall property over to his (Roth) property. [T., p. 47].

54. The deed into the Plaintiffs [Defendants' Exhibit 2] dated October 27, 1994 does not reference anything concerning water rights. [T., pp. 51-52].

18

55.     Mr. Roth acknowledged that relative to the water rights referenced in the Kurtz to DeMatteis deed from 1927 [Plaintiffs' Exhibit 6], that he has never bathed, nor swam in the stream, nor raised any fish. [T., pp. 55-57].

56.     Mr. Roth confirmed that the water that went into the tank was used for personal consumption. [T., p. 57].

57.     Mr. Roth said there is not enough space to drill another well since he has "to be so many feet from septic systems and property lines and sink holes." He has not considered drilling his existing well deeper, noting that it is already 500 feet deep. [T., p. 59].

58.     Mr. Roth admitted that there have been a few occasions when he has gone on to the Marshall property to clean the leaves off the screen, but denies that he did so without Mr. Marshall's knowledge or permission. [T., pp. 60-62].

59.     Mr. Roth admitted that there is nothing in writing from Mr. Marshall conveying any water rights from his property onto Plaintiffs; e.g., there is no easement recorded at the courthouse. [T., p. 61].

19

60. Mr. Roth testified that it is his understanding that the "excepting and reserving" language in the deed is a reservation to the seller (Grantor) of the deed, and not to the buyer (Grantee). [T., p. 65].

61. **Richard B. Marshall** acquired his property in Tyrone Township in 1967. [Defendant's Exhibit 4 and T., p. 76].

62. The deed dated November 24, 1967 and recorded at Blair County Deed Book Volume 867, Page 395 wherein the Defendant, Richard B. Marshall and his then wife became owners of the property in Tyrone Township, consisting of 57.08 acres, contained the following language:

> ALSO, THE PERPETUAL right to grantees, their heirs and assigns to use without liability (as defined in deed from Gail Scott Kurt and Charles M. Kurtz, her husband, to Mary D. DeMatteis, dated November 16, 1927, and recorded in Blair County Deed Book 366, Page 265), the water flowing through lands conveyed by said deed as well as the lands herein conveyed for the purpose of swimming, bathing and propagation of fish.

[Defendants' Exhibit 4].

63. Mr. Marshall testified that the water comes off the pond on Mr. Difolco's property, down their falls and into a pool. The stream continues and flows away from the pool and away from the Plaintiffs' property and ultimately goes through the Priddy property and ends up in a pond on the Albright property. [T., pp. 79-80, Defendant's Exhibit 5]. This testimony is consistent with Mr. Albright's testimony.

20

64.    Defendant's Exhibit 7 (1) is a photograph of the water fall. Exhibit 7 (2) is a photo of the pipe and part of the ditch located below the water fall. This is the same pipe that used to provide water to the holding tank on the Roth property. Exhibit 7(3) shows Kurtz Lane, with part of the ditch on the left side of the lane. The water fall and pool would be to the right side of Kurtz Lane. The ditch was made from below the falls, tapping into a pool, running through a galvanized pipe, 12 inches, under the road to the other side and through the ditch. Mr. Marshall acknowledged that he had no idea when the pipe was put in, or who put it in, but stated that it was present when they bought the property. Exhibit 7(5) shows a remnant of the ditch. Exhibit 7(8) shows a section still visible. Mr. Marshall indicated that the ditch is not much more than 3 to 4 feet wide. Finally, Exhibit 7(12) shows a remnant of the ditch. [T., pp. 86-90, Defendants' Exhibit 7].

65.    Mr. Marshall testified that the ditch was never deep enough for anyone to swim or bathe in it, nor raise fish. [T., p. 90]. Mr. Marshall confirmed that the flow of water through the ditch "was very unsteady, unpredictable" and "dependent on the weather conditions." [T., pp. 90 & 99].

21

66. Mr. Marshall stated that the ditch ultimately led down to Roth's' property, went over into a field where the holding tank was, and then fed into the holding tank. [T., p. 91].

67. Mr. Marshall has no idea as to when the holding tank was installed, nor by whom. [T., p. 92].

68. Mr. Marshall was aware that after Carl and Tracey Roth built their home, they continued to get water from the holding tank. [T., pp. 94 and 98-99].

69. Mr. Marshall agreed that Carl and Tracey Roth had problems with the lack of water flow from the ditch into the holding tank, which led to the installation of a pipe. [T., pp. 99-100].

70. Mr. Marshall indicated that Carl and Tracey Roth "were very good friends" and that he agreed to put the pipe in "as a friend." [T., p. 100].

71. Mr. Marshall recalled an agreement being made in 1997, however, it is his recollection that the agreement was for the benefit of Tracey Roth. Mr. Marshall claims that he knew Mark Roth had his own well and that he felt no obligation to Mr. Roth. He also denied that Mr. Roth was part of this conversation. It was also Mr. Marshall's recollection that he paid the entire amount for the pipe, although he acknowledged that he may have only paid one-half of the cost. [T., pp. 100-102; 112-113].

22

72. Relative to the discrepancies as to who was present and what the exact nature of the discussion and agreement was during this 1997 meeting, we find Harry Albright's testimony to be more credible. In fact, Mr. Marshall acknowledged that Mr. Albright is a friend and a good neighbor. [T., p. 111].

73. Mr. Marshall confirmed that Harry Albright and Cletus Steinbeiser installed the pipe and agreed that the pipe also benefited Mr. Albright. [T., p. 102].

74. A dispute arose with Mark Roth, and Mr. Marshall did not want Mr. Roth to continue entering upon his property. Therefore, he had Attorney Traci Naugle send a letter to Mr. Roth dated October 26, 2016 [Defendants' Exhibit 9]. Mr. Marshall acknowledged that after the letter was sent, he shut off the water by cutting the pipe. He then engaged the services of Attorney Stants, who sent a letter to Plaintiffs' counsel, Attorney Wicks, dated February 13, 2017. [Defendants' Exhibit 10 and T., pp. 106-110].

75. Mr. Marshall agreed that there was a water flow of 5 gallons per minute from the installed pipe, as measured by Mr. Albright and Mr. Steinbeiser. [T., p. 113].

76. In review of the survey attached to Defendant's Exhibit 8, being the deed dated May 6, 1982 from Richard B. Marshall and Elizabeth J. Marshall into Carl D. Roth and Tracey D. Roth, Mr. Marshall acknowledged that the holding tank, which he indicated was close to the northern corner of Plot A1, was located at the approximate end of the

small stream depicted on the survey that flowed over his property onto the Roth property. [T., pp. 114-115, Defendant's Exhibit 8].

77.  Mr. Marshall was personally aware that this small stream ultimately ran into the tank on the Roth property. [T., p. 115].

78.  Mr. Marshall stated that the small stream depicted on the survey is actually "the ditch" and "[i]t's always been a ditch. [T., p. 118].

79.  Mr. Marshall acknowledged that, periodically, individuals would have to clear leaves from the ditch to get the water flowing again, requiring such individuals to enter upon his property.  [T., pp. 117-118].

80.  Mr. Marshall stated that the "no trespassing" signs situated on his property are mostly for hunters, with whom he has had problems in the past.  He has never sought to have anyone prosecuted who entered upon his property for the purpose of clearing leaves out.  [T., pp. 117-118].

81.  The Defendant, **Bryce Marshall,** is the son of Richard G. Marshall. [T., p. 120].

82.  Bryce Marshall owns real property in Tyrone Township which is adjacent to the Plaintiffs' property.  The deed into Bryce Marshall is dated February 1, 2006. [Defendants' Exhibit 11].  This property formerly belonged to Tracey Roth and had a house situate on it.  [T., pp. 120-121].

24

83. When Richard G. Marshall sold the property to Carl and Tracey Roth, he retained a right of first refusal. [T., p. 121].

84. Bryce Marshall was aware that his father allowed a pipe to be installed to ensure that Tracey Roth received water at her home. The conditions of the ditch drying up and the leaves clogging the drain had gone on for years. Once the pipe was installed, it improved the flow of water. [T., p. 123].

85. When Bryce Marshall purchased the property, his water source was originally from the holding tank. He had a well drilled, at which time the well driller shut off the line coming from the holding tank to the house. [T., pp. 123-124].

86. Bryce Marshall had no knowledge that the Plaintiffs had a line running from the holding tank to their home. On one occasion, when he inquired of Mark Roth as to what purpose he used the water, Mr. Roth explained that he had an insufficient supply of water from his well and that he would occasionally attach a garden hose to the tank. [T., pp. 124-125].

87. Bryce Marshall testified that on one weekend, they discovered a new, long, spiraling black line running from the existing water pool up through the waterfalls and into Mr. DiFalco's pond. This line was put in by Mark Roth without permission from the Marshall family. The Marshall family contacted Attorney Traci Naugle and upon

25

receiving a response from her, Richard G. Marshall disconnected the line. [T., pp. 125-126].

88. Bryce Marshall indicated that Mark Roth and his father had previously argued about the water issues. As Bryce Marshall explained: "That was always an ongoing thing". [T., p. 127].

89. Bryce Marshall personally spoke to Mark Roth in 2010 or 2011. He confirmed that, thereafter, Mr. Roth still came upon the Marshall property to talk to his father. Bryce Marshall explained that there were times when they would give Mr. Roth permission to clean out the ditch, and other times they would clean it out themselves. Bryce Marshall also acknowledged that Mr. Roth would seek permission to enter upon their land, but that such would result in an argument between Mr. Roth and Bryce's father. [T., p. 128].

90. Bryce Marshall confirmed that a deed was conveyed in 2006 from his father into his father and he and his brother, so that all three are the joint owners of the real property where the water supply was cut off. [T., p. 129].

**_SUPPLEMENTAL DISCUSSION:_**

We incorporate the _Discussion_ section set forth in our original Opinion and Order dated October 29, 2018. Upon further review of this matter, we agree with the Plaintiffs that the "Excepting and reserving" language set forth in the deed dated November 16,

26

1927 from Gail Scott Kurtz and Charles M. Kurtz, her husband, to Mary D. DeMatteis (DBV 366-265) should be interpreted as containing two separate clauses. The first clause "[e]xcepts and reserves . . . the perpetual right to the Grantors . . . their heirs and assigns, to use for the purpose of swimming, bathing and propagation of fish the water flowing through other lands of the Grantor herein, as well as through land herein surveyed . . . "

The clause that the Plaintiffs are relying upon and which is really at issue herein is the last clause, which reads "Grantors, their heirs and assigns, shall not divert the stream of water now flowing through lands herein conveyed . . ."

The Plaintiffs argue that this clause constitutes a covenant running with the land.

Covenants, to "run with the land", ordinarily must affect land and are intended to pass with it, while covenants which are merely "personal" do not so run. **Logston v. Penndale, Inc.**, 576 A.2d 59, 61 (Pa. Super. 1990).

There can be no dispute that the 1927 conveyance clearly indicated that there was a "stream of water now flowing through the lands herein conveyed." The deed does not describe exactly where this stream is located. The deed does not provide any physical description of the stream (e.g., its width, length or depth or where it starts or where it ends). There were no surveys attached to this 1927 conveyance. As a result, we are left with "trying to find the pieces to complete the puzzle".

27

The only witness who was not a party to this lawsuit was Harry Albright. Mr. Albright knows the parties and from all appearances, seems to have a positive relationship with all involved. We find his testimony to be honest and credible.

Mr. Albright testified that he has lived on his neighboring property since 1947. The Plaintiff's father, Carl Roth, acquired his property on September 13, 1948. Mark Roth was born in 1967 and grew up on his property. Richard Marshall originally acquired his property on November 11, 1967. All of these individuals clearly have some level of familiarity with the properties and stream in question.

Once again, we focus on Mr. Albright's testimony. Mr. Albright provided the following history:

> Q.     And can you tell the Court what led to the discussion?
>
> A.     Well, for 50 years, my farm has been getting water since around 1800 out of that, and it's still my main source of water even now. And about 50 years or so ago when I was just a kid, when the water got low in the summer, there was very little water coming down that stream up at A.J. Difolco's. Well, it would get real low and Roth would start to run out of water, and then they would go up and divert some down that manmade - - - that was a manmade stream. And then my grand pap and me would go up and transfer more down the main stream because we'd run out down at the farm. So that went on for like 50 years or more.
>
> And then I understood Mr. Marshall was going to build a pond. And I did not understand exactly where he planned to run the water from the spillway, whether he was going to run it in the main stream or down the manmade one. And I talked to him about it, and I said you need to run it into the main stream. And then we decided for Mr. Marshall's benefit, my

28

benefit, and Roth's benefit, something needed to be changed how much water was going one way or the other in dry weather.

So we had a meeting at Mark Roth's house; Mr. Marshall, me and Mark Roth. And I brought up the idea of the only way I knew to control it would be to put a pipeline in it. And that way, Mr. Marshall would get more water, I'd get more water, Roth would be assured of water in dry weather. And so we agreed to that. And to my best understanding, Mr. Marshall agreed to pay for half the pipe. I paid for half the pipe. And it was put in. And the understanding was that that could run full bore 24/7. And it ran approximately five gallon a minute. And from 1997 up until five or six years or so ago, everything - - - everybody was satisfied. Everything was going okay. And now we're where we're at.

[T., pp. 14-15].

Mr. Albright testified that the Marshall to Roth leg of the stream was "man-made" and that the main stream did not run naturally to the Roth parcel. [*See Findings of Fact Nos. 31 & 32*].

Mr. Albright also testified that the water that flowed to the holding tank on the Roth property came from the man-made stream that originated at a pool just under the waterfall on the Marshall property. [*See Finding of Fact No. 34*].

We find Mr. Albright's testimony as set forth above to be clear and credible and, frankly, dispositive of the issue before us. The man-made stream was a diversion of water flow from the "main stream", as Mr. Albright termed it. We believe that a reasonable interpretation of the clause set forth in the 1927 deed restricting the grantors, their heirs and assigns, from diverting "the steam of water now flowing through

29

lands herein conveyed" referenced this "main stream", and not the man-made diversion of water that was made some time thereafter. The deed restriction references "stream" in the singular, not in the plural.

Mr. Albright's testimony is supported by the testimony of Richard Marshall, who indicated that the "small stream" that flowed over his property onto the Roth property and into the holding tank was actually "the ditch" and "[i]t's always been the ditch". [See Findings of Fact Nos. 71-74]. We find Mr. Marshall's testimony to be credible in this regard.

Finally, Mr. Roth admitted that he could not refute the assertion that the holding tank on his property was fed by a pipe that traveled through the Marshall property through a man-made ditch dug from a pool below the waterfall that comes from the Difolco property onto the Marshall property. He acknowledged that the origin of the stream bed is unknown to him. [See Findings of Fact Nos. 50-51]. Further, Mr. Roth was not involved in the installation of the pipe, nor was he aware of when the pipe was installed. [See Finding of Fact No. 52].

Based upon the above, we make the following:

30

## AMENDED CONCLUSIONS OF LAW:

1.    The same principles that apply to the interpretation of a contract apply to the interpretation of a deed. See *New Charter Coal Co. v. McKee*, 191 A.2d 830, 834 (Pa. 1963).    The nature and quantity of the interest conveyed by a deed "must be ascertained from the instrument itself." *In re Property of W. R. Covert*, 186 A.2d 20, 23 (Pa. 1962) (quoting *Yuscavage v. Hamlin*, 137 A.2d 242, 244 (Pa. 1958)). Thus, "the language of the deed shall be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed." *Highland v. Commonwealth*, 161 A.2d 390, 402 (Pa. 1960).

2.    When it comes to water rights, the construction of those rights is to be "most liberal" and "most advantageous" to the grantee without being onerous to the grantor. *Eastern Pennsylvania Power Company v. Lehigh Coal and Navigation Co.*, 246 Pa. 72, 74 (Pa. 1914).

3. In the deed dated November 16, 1927 from Gail Scott Kurtz and Charles K. Kurtz, her husband, to Mary P. DeMatteis (DBV 366-265), the property description contained in the following clause:

31

> Excepting and reserving, however, from the force and operation of this deed, the perpetual right to the grantors herein, their heirs and assigns, to use for the purposes of swimming, bathing and propagation of fish the water flowing through other lands of the grantors herein as well as through land herein conveyed, and by acceptance of this deed the grantee, for herself, their heirs and assigns, release the said grantors, their heirs and assigns, from any and all liability for any contamination resulting, directly or indirectly, from such usage of the stream. Grantors, their heirs and assigns, shall not divert the stream of water now flowing through lands herein conveyed. - - -

4.     The water course which provided water from the stream on the Defendants' property to the holding tank on the Plaintiffs' property was not a naturally occurring stream, but instead, traveled from a man-made ditch dug at some point prior to the Defendants' acquiring their property.

5.     In order to be entitled to reasonable use of water flowing from the property of another, the party claiming such a right has the burden of proving the water in question is flowing or tributary. *Village of Four Seasons Association, Inc. v. Elk Mountain Ski Resort, Inc.,* 103 A.3d 814, 820-22 (Pa. Super. 2014).

6.     The restrictive covenant set forth in the Kurtz to DeMatteis deed dated November 16, 1927, based upon our reasonable interpretation of the subject clause, applies to a "stream of water now flowing through lands herein conveyed", i.e., what

32

was described as "a main stream" by Harry Albright, and not the man-made ditch that diverted water from the Marshall property to the holding tank on the Roth property.

7. As a result, we do not find that the act of terminating the flow of water through the man-made ditch by the Defendant, Richard B. Marshall, constitutes a violation of the restrictive covenant.

8. Restrictive covenants are to be strictly construed against persons seeking to enforce them and claiming benefit thereof and in favor of free, unrestrictive use of property. *Logston v. Penndale, Inc.,* 576 A.2d 59, 62 (Pa. Super. 1990).

9. Plaintiffs may not claim any prescriptive rights in the water as there was no evidence presented at trial which established that there use of the water was adverse, open, notorious, continuous and uninterrupted use for a period of twenty-one (21) years. *Walley v. Iraca*, 520 A.2d 886, 889 (Pa. Super. 1987).

10. The party asserting a prescriptive easement must demonstrate "clear and positive" proof. *Wally,* 520 A.2d at 889.

11. Evidence presented at trial indicated that Plaintiffs' use of the water from the holding tank was a matter of personal convenience and did not establish that they required such water as a strict necessity.

12.     An easement by necessity is always of strict necessity; an easement by necessity never exists as a mere matter of convenience. *Youst v. Keck's Food Service, Inc.,* 94 A.3d 1057, 1075 (Pa. Super. 2000).

13.     The installation of the pipe established that the use of the water which flowed from the stream on Defendants' property to the holding tank on Plaintiffs' property was entirely permissive and could be terminated at any time, thus creating nothing more than a license. *Thompson v. McElarney*, 82 Pa. 174, 177-78 (1876).].

14.     In general, a license is a mere personal or revocable privilege to perform an act or series of acts on the land of another, which conveys no interest or estate; a licensee is simply given permission by the occupant of the land to do something that otherwise would be a trespass. *Morning Call, Inc., v. Bell Atlantic-Pennsylvania, Inc.*, 761 A.2d 139, 144 (Pa. Super. 2000).

15.     A license is distinguishable from an easement because it is usually created orally, is revocable at the will of the licensee, and is automatically revoked by the sale of the burdened property. *Id.* at 144.

16.     A license is generally considered a "mere personal privilege to perform an act or series of acts on the land of another." *Kovach v. General Telephone Co. of Pennsylvania*, 489 A.2d 883, 885 (Pa. Super. 1985).

34

17. Licenses are freely revocable and only become irrevocable when a licensee relies to its detriment upon it. *Zivari v. Willis*, 611 A.2d 293, 296 (Pa. Super. 1992).

18. An injunction is a court order that can prohibit or command virtually any type of action. It is an extraordinary remedy that should be issued with caution and "only where the rights and equity of the plaintiff are clear and free from doubt, and where the harm to be remedied is great and irreparable." 15 Standard Pennsylvania Practice 2d §83:2 (2005). *Big Bass Lake Community Assn. v. Warren*, 950 A.2d 1137, 1144 (Pa. Cmwlth. 2008).

19. The required elements of injunctive relief are: a clear right to relief; an urgent necessity to avoid an injury that cannot be compensated in damages; and a finding that greater injury will result from refusing, rather than granting, the relief requested. *Id.*

20. Plaintiffs have failed to establish a clear right to relief, an urgent necessity to avoid an injury that cannot be compensated in damages, or that a greater injury will result from refusing the relief they have requested.

21. Based on the factors stated herein, Plaintiffs have not met their burden of establishing that they are entitled to claim any rights in the water flowing through Defendants' property and, as a result, their request for injunctive relief must be denied.

In light of the foregoing, we now enter the following:

O

R

D

E

R

36